UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES

v.

(1) MAHDI MOHAMMAD SADEGHI, a/k/a
    MOHAMMAD MAHDI SADEGHI and
(2) MOHAMMAD ABEDININAJAFABADI,
    a/k/a "MOHAMMAD ABEDINI"

    Defendants.

No. 1:24-CR-10391-IT

## GOVERNMENT'S MOTION FOR REVOCATION OF RELEASE ORDER

i

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ......................................................................................................... III

**FACTUAL BACKGROUND** ..................................................................................................... 2

    **THE OFFENSE CONDUCT** ................................................................................................... 2

        *Sadeghi's Connection to Abedini and SDRA.* .................................................... 4

        *Abedini Established Illumove in Switzerland as a Front For SDRA.* ..................... 5

        *Sadeghi Transferred and Helped Transfer Sensitive, Non-Public Goods and Technology from U.S. Company 1 to Abedini and/or SDRA in Iran.* ......................................... 5

    **PROCEDURAL HISTORY AND THE DETENTION PROCEEDINGS** ................................................ 6

    **LEGAL FRAMEWORK** ...................................................................................................... 8

**ARGUMENT** ........................................................................................................................ 9

    **THE STATUTORY FACTORS OVERWHELMINGLY SUPPORT A FINDING THAT THE DEFENDANT PRESENTS A SERIOUS RISK OF FLIGHT WARRANTING DETENTION** ....................................... 9

        *The Nature and Circumstances of the Offense* .................................................. 10

        *The Weight of the Evidence* ............................................................................. 12

        *The History and Characteristics of the Defendant* ............................................. 14

        *The Nature and Seriousness of the Danger Presented by Release* ........................ 17

**CONCLUSION** .................................................................................................................. 17

## TABLE OF AUTHORITIES

### Cases

*United States v. Acherman,*
   No. 15-10046-LTS, 2015 WL 4576926 (D. Mass. July 30, 2015) ......................................... 16
*United States v. Amar,*
   300 F. Supp. 3d 287 (D.D.C. 2018) ...................................................................................... 16
*United States v. Butina,*
   No. 18-00218 (D.D.C. July 24, 2018) ECF No. 15................................................................ 16
*United States v. Gray,*
   529 F. Supp. 2d 177 (D. Mass. 2007) ................................................................................... 12
*United States v. Ho,*
   No. 16-CR-46-TAV-HBG-1, 2016 WL 5875005 (E.D. Tenn. Oct. 7, 2016) .......................... 16
*United States v. Leon,*
   766 F.2d 77 (2d Cir. 1985) ..................................................................................................... 9
*United States v. McForbes,*
   109 F. Supp. 3d 365 (D. Mass. 2015) ................................................................................... 14
*United States v. Mousavi,*
   604 F.3d 1084 (9th Cir. 2010)............................................................................................... 13
*United States v. Patriarca,*
   948 F.2d 789 (1st Cir. 1991) ................................................................................................... 8
*United States v. Perez-Gonzalez,*
   445 F.3d 39 (1st Cir. 2006) ................................................................................................... 13
*United States v. Salerno,*
   481 U.S. 739 (1987) ............................................................................................................... 8
*United States v. Tajideen,*
   No. CR 17-46 (RBW), 2018 WL 1342475 (D.D.C. Mar. 15, 2018)....................................... 16
*United States v. Tortora,*
   922 F.2d 880 (1st Cir. 1990) ................................................................................................... 8
*United States v. Townsend,*
   897 F.2d 989 (9th Cir. 1990).................................................................................................. 10
*United States v. Vick,*
   No. 128-10126-ADB, 2017 WL 773860 (D. Mass. Feb. 28, 2017)........................................ 12
*United States v. Zarrab,*
   No. 15-Cr.-867 (RMB), 2016 WL 3681423 (S.D.N.Y. June 16, 2016).............................. 11, 12
*United States v. Zhang,*
   55 F.4th 141 (2d Cir. 2022).................................................................................................... 12

### Statutes

18 U.S.C. § 3142....................................................................................................*passim*
18 U.S.C. § 3145(a) ........................................................................................................... 8
50 U.S.C. § 1701(a) .......................................................................................................... 10
50 U.S.C. § 1702............................................................................................................... 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>(3) MAHDI MOHAMMAD SADEGHI, a/k/a<br>    MOHAMMAD MAHDI SADEGHI and<br>(4) MOHAMMAD ABEDININAJAFABADI,<br>    a/k/a "MOHAMMAD ABEDINI"<br><br>    Defendants. | No. 1:24-CR-10391-IT |

## GOVERNMENT'S MOTION FOR REVOCATION OF RELEASE ORDER

The United States of America moves pursuant to 18 U.S.C. § 3145(a)(1) for the revocation of the order directing the release of defendant Mahdi Mohammad Sadeghi (hereinafter, "Sadeghi" or "Defendant") pending trial. Sadeghi poses a flight risk based on his extensive ties to Iran and the serious national security charges in the Indictment. If convicted, Sadeghi faces a lengthy prison sentence and other financial and employment consequences. Sadeghi was born and educated in Iran and maintains extensive personal and professional ties to Iran that will allow him to resettle with his immediate family and seek gainful employment in a country from which he cannot be extradited and where he would remain beyond the reach of the United States justice system.

It is also not unreasonable to believe that the government of Iran would help facilitate Sadeghi's flight to Iran. Iran has repeatedly demonstrated its willingness to go to great lengths to help its nationals who have been charged by the United States. Here, Sadeghi has special skills that have benefited, and could continue to benefit, the government of Iran. As set forth below,

1

Sadeghi has repeatedly shown support for his co-defendant's Iranian company ("SDRA")[1]; an organization that plays a significant role in Iran's lethal drone program. Moreover, Sadeghi has relationships with individuals, like his co-defendant Mohammad Abedini ("Abedini"), who have powerful connections to Iranian government officials.

There is no condition or combination of conditions that can reasonably assure Sadeghi's appearance at future proceedings. The release order should be revoked and Sadeghi should be ordered detained pending trial.

## FACTUAL BACKGROUND

### The Offense Conduct

On December 19, 2024, Sadeghi and Abedini were indicted with one count of conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations ("ITSR"), in violation of Section 1705 of Title 50 of the United States Code, and Part 560 of Title 31 of the Code of Federal Regulations; and multiple substantive counts of violating the IEEPA and the ITSR. Doc. 14. Abedini was also charged with conspiracy to provide material support to a foreign terrorist organization resulting in death, in violation of Section 2339B(a)(1) of Title 18 of the United States Code, and with provision and attempted provision of material support to a foreign terrorist organization resulting in death, in violation of Section 2339B(a)(1) of Title 18 of the United States Code. *Id.*

Sadeghi and Abedini were initially charged by criminal complaint on December 13, 2024. Doc. 6. The criminal complaint affidavit, introduced as an exhibit at the detention hearing, describes the charged conduct in detail and establishes both the sophistication of the scheme and

---

[1] The full name of Abedini's Iranian company is San'at Danesh Rahpooyan Aflak Co. (hereinafter, "SDRA" or "SADRA").

the strength of the government's evidence.  Affidavit in Support of Criminal Complaint, Exhibit 1, Doc. 28-1.  In summary, Sadeghi utilized his U.S. contacts and employment to illegally transfer and to facilitate the transfer of goods and technology—including electronic components that have drone applications—to Abedini and to SDRA in Iran.

> 1.  Sadeghi's Formation of Iranian Company 1.

As set out in the complaint, beginning in or about August 2015, Sadeghi, who has an undergraduate degree from the University of Tehran, sought to utilize his ties to Iran to procure funding for a company he had recently helped found in Massachusetts ("U.S. Company 2").  Doc. 28-1 at ¶ 35.  Specifically, Sadeghi sought funding from the Iranian National Elites Foundation ("INEF"), which is an Iranian governmental organization whose main purpose is to recognize, organize, and support Iran's elite national talents.  *Id.* at ¶ 36.

In or about August 2016, Sadeghi traveled to Iran and made an in person presentation to INEF in support of his business proposal.  *Id.* at ¶ 37.  Sadeghi ultimately formed an Iranian-based sister company ("Iranian Company 1") for his Massachusetts company in exchange for funding from INEF.  *Id.* at ¶¶ 36-37.  During the period in which Sadeghi traveled to Iran and sought funding from INEF, Sadeghi was on multiple email chains that demonstrate he was aware that his conduct was illegal.[2]  *Id.* at ¶ 38.  Nevertheless, as described below, Sadeghi continued to violate the law utilizing his network of Iranian contacts.

---

[2] The complaint referred to emails in which Sadeghi and his business associates joked about going to prison.  For example, on or about December 3, 2015, Person 2 sent an email to Sadeghi and Person 1 to schedule a meeting.  In that email, Person 2 referred to Person 1 as the "CEO, President and owner of [Iranian Company 1]" and asked to have weekends off.  Person 1 responded, "[Y]ou can have all the weekends off you want if you promise to bring me some chai when I'm in jail."  In the detention proceedings below, counsel for Sadeghi claimed that the government presented these emails "in a manner that is intentionally misleading," claiming that the government took these emails out of context.  Doc. 47 at 2.  This argument appears to be based

2.  Sadeghi's Connection to Abedini and SDRA.

Specifically, shortly after forming Iranian Company 1, in or about November 2016, Sadeghi, through Iranian Company 1, entered into a contract with Abedini's Iranian company, SDRA. *Id.* at ¶ 46. At the time, SDRA's primary business was the sale of technology (specifically the Sepehr Navigation System) to the Iranian government, including in support of the Iranian Revolutionary Guard Corp.'s ("IRGC") Aerospace Force drone program. *Id.* at ¶¶ 6, 10, 91, 94-95. The IRGC Aerospace Force is the strategic missile, air, and space force within the IRGC. *Id.* at ¶ 6. The IRGC is an Iranian military and counterintelligence organization under the authority of the Supreme Leader of Iran. *Id.* Among other things, the IRGC plays a key role in Iran's development of ballistic missiles and in Iran's support for international terrorism and foreign terrorist organizations, such as Hamas, Hizballah, and others. *Id.* The primary application of SDRA's Sepehr Navigation System is in Unmanned Aerial Vehicles ("UAVs")—also known as drones—as well as cruise and ballistic missiles. *Id.* The IRGC was designated by the United Sates government as Foreign Terrorist Organization in 2019. *Id.* at ¶ 10. SDRA sells the Sepehr Navigation System almost exclusively to the IRGC. *Id.* ¶ 95. Certain of the Shahed drones used in IRGC-supported terrorist attacks in the Middle East have resulted in the deaths of U.S. servicemembers. *Id.* ¶ 11.

The evidence indicates that, at all relevant times, Sadeghi was familiar with SDRA's business operations. For example, among other things, Sadeghi's IP-login history reflects that

---

primarily on the notion that "chai" would not be available in an American prison. Doc. 47 at 2. The defendant's argument is as nonsensical as it is implausible. An objective reading of the quote provides the context that Sadeghi claims is missing. That such a joke would come to mind while the defendant and his associates were violating *United States law*, as opposed to Iranian law, proves the government's point.

Sadeghi utilized a SDRA IP address on multiple occasions while in Iran, indicating that Sadeghi was physically present at SDRA on multiple occasions. *Id.* at ¶ 48. Additionally, in or about December 2016, Sadeghi placed an order for U.S.-origin electronic components from a U.S.-based manufacturer, listing his home address in Massachusetts as the billing address, but listing SDRA as the customer reference for two of the items on the invoice. *Id.* at ¶ 47. The bill of sale for those items included a certificate of compliance, which stated: "NOTE: ONE OR MORE ITEMS ON THIS ORDER ARE CONTROLLED FOR EXPORT." Based on that order listing SDRA as the customer, as well as the timing of certain of Sadeghi's travel to Iran, it is likely that he traveled with the electronic components to Iran, in violation of U.S. export control and sanctions laws. *Id.* Moreover, during a voluntary post-arrest interview with the Federal Bureau of Investigation ("FBI") Sadeghi admitted to having visited SDRA's offices in Tehran on multiple occasions. Declaration of Robert Plumb, Exhibit 2, Doc. 28-2 at ¶ 5.

3.  <u>Abedini Established Illumove in Switzerland as a Front For SDRA.</u>

Thereafter, Sadeghi not only helped procure and provide U.S.-origin electronic components and technology to Abedini and SDRA, but Sadeghi also helped facilitate a lucrative contract between Abedini and Sadeghi's U.S. employer, a Massachusetts-based global semiconductor company ("U.S. Company 1"). Doc. 28-1 at ¶¶ 59-62, 65-66, 68-73.

In or about 2018, Abedini established Illumove in Lausanne, Switzerland to serve as a front company for SDRA. *Id.* at ¶¶ 52-53; 55-56. In his business plan for Illumove, Abedini listed Sadeghi's U.S. Company 2 as a current customer. *Id.* at ¶ 54.

4.  <u>Sadeghi Transferred and Helped Transfer Sensitive, Non-Public Goods and Technology from U.S. Company 1 to Abedini and/or SDRA in Iran.</u>

In or about March 2019, Sadeghi was hired by U.S. Company 1 to work as a microelectromechanical systems engineer. *Id.* at ¶ 58. Soon thereafter, Sadeghi began taking steps

5

to introduce Abedini to other employees at U.S. Company 1. *Id.* at ¶ 59. In or about August 2019, despite the fact that Sadeghi knew that Abedini had just created Illumove, Sadeghi misleadingly represented to U.S. Company 1 employees that he had collaborated "closely" with the Illumove "team." *Id.* at ¶ 63. Indeed, Sadeghi's only prior collaboration had been with the Iranian company SDRA. *Id.* at ¶ 64.

Thereafter, Abedini (Illumove), with Sadeghi's assistance, entered into contract with U.S. Company 1 in which Illumove would develop an evaluation board to test a wide range of U.S. Company 1 inertial sensors, including the type of sensors used in the Sepehr Navigation System. *Id.* at ¶¶ 73-75.

During the course of that contract, Sadeghi transferred and helped facilitate the transfer of sensitive, non-public U.S.-origin goods and technology from U.S. Company 1 to Abedini, with knowledge that such goods and technology were destined for Iran and were for the benefit of Iran, the government of Iran, and/or SDRA. *Id.* at ¶¶ 66, 82-86. Sadeghi did this with the full understanding that Abedini was running SDRA from Iran. Indeed, Sadeghi traveled to Iran on multiple occasions during the conspiracy and visited SDRA and/or Abedini multiple times during those visits. *Id.* at ¶ 86; Doc. 6-2 at ¶ 5.

### Procedural History and the Detention Proceedings

Sadeghi was arrested on December 16, 2024. At his initial appearance later that day, the government moved for detention under 18 U.S.C. § 3142(f)(2)(A), alleging that the defendant posed a serious risk of flight. Doc. 11. Following an interview, the U.S. Probation Office ("Probation") concluded that Sadeghi posed a serious risk of flight and recommended that he be detained pending trial. The Court set the matter for a detention hearing, which was subsequently

continued until January 14, 2025.

Meanwhile, at the request of the United States, Italian authorities provisionally arrested Abedini on December 16, 2024, at Milan's Malpensa Airport, Italy.  He was detained until on or about January 12, 2025, at which time, the Italian government released him.[3]  Open-source reporting has linked Iran's detention of Cecilia Sala, an Italian journalist in Iran, and her subsequent release to Abedini's arrest and subsequent release in Italy.[4]  Abedini has now returned to Iran.

As to Sadeghi, Chief United States Magistrate Judge Donald Cabell convened a hearing on the motion on January 14, 2025.  The government presented the testimony of one witness at the detention hearing, and the parties presented argument.  On January 21, 2025, after producing additional discovery to the defense, the government submitted a supplemental memorandum in support of detention under seal.  *See* Doc. 37.

On March 20, 2025, the Chief Magistrate Judge Cabell held a status conference at which the court indicated that it intended to order Sadeghi released on conditions.  Doc. 54.  Chief Magistrate Cabell subsequently entered an order setting those conditions, however, the order did

---

[3] Angelo Amante and Emilio Parodi, *Iranian businessman arrested in Italy returns home*, REUTERS, Jan. 12, 2025, *available at* https://www.reuters.com/world/italian-minister-requests-revoking-arrest-detained-iranian-businessman-2025-01-12/.

[4] *See* Nicole Winfield, *Iran Warns Italy that Bilateral Ties at Risk if it Bows to 'Hostile' US Demands Over Drone Suspect*, Washington Post, Jan. 3, 2025, *available at* https://www.washingtonpost.com/world/2025/01/03/italy-iran-journalist-engineer/3659f8c4-c9f2-11ef-a9b8-74e0b395057f_story.html; Marcus Walker, *Italy, Caught Between U.S. and Iran, Seeks to Free Journalist Cecilia Sala*, WALL STREET JOURNAL, Jan. 3, 2025, *available at* https://www.wsj.com/world/middle-east/italy-caught-between-u-s-and-iran-seeks-to-free-journalist-cecilia-sala-5bb496c1; Rebecca Rosman, *Italy releases Iranian man wanted by U.S. over drone attack that killed 3 soldiers*, REUTERS, Jan. 12, 2025, *available at* https://www.npr.org/2025/01/12/nx-s1-5257521/italy-iran-drone-strike-us-jordan-abedini-sala.

not enumerate reasons for the court's decision to release Sadeghi.  Doc. 56.[5]  The release order

was stayed pending the government's motion before this Court.

**Legal Framework**

Jurisdiction over the review of the release order issued by the magistrate judge lies with

this Court pursuant to 18 U.S.C. § 3145(a), which provides:

> If a person is ordered released by a magistrate judge . . . the attorney for the
> Government may file, with the court having original jurisdiction over the offense,
> a motion for revocation of the order.

18 U.S.C. §3145(a).

To justify detention, the government must demonstrate by a preponderance of the evidence

that a defendant poses a risk of flight, or by clear and convincing evidence that he is a danger to

the community.  18 U.S.C. §3142; *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991);

*see also United States v. Salerno*, 481 U.S. 739, 741 (1987).  In assessing whether suitable release

conditions exist, a court must consider the nature and circumstances of the offense charged, the

weight of the evidence against the person, the history and characteristics of the accused, including

family ties, employment and other factors, and the nature and seriousness of the danger posed by

the person's release.  18 U.S.C. § 3142(g).

As it relates to the matters now before this Court, in *United States v. Tortora*, 922 F.2d

880, 882 (1st Cir. 1990), the First Circuit held that a district judge must conduct a *de novo* review

of a contested detention order issued by a magistrate judge.  *Id.* at 883 n. 4.  *Tortora* mandates that

the district court must make an independent determination of the detention decision, unconstrained

by the limits of the magistrate's conclusions or the record established in the original detention

---

[5] The conditions set include home confinement, electronic monitoring, and a secured bond
in the amount of $100,000.

hearing.  *See also United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985) ("a district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion").

Here, the magistrate judge did not make any findings of fact or address the government's arguments, beyond reaching the ultimate determination to set conditions of release.  (Doc. 56, 59).

## **ARGUMENT**

### **The Statutory Factors Overwhelmingly Support a Finding that the Defendant Presents a Serious Risk of Flight Warranting Detention**

Sadeghi presents as a serious risk of flight that conditions of release simply cannot meaningfully address.  He is accused of illegally sending U.S.-origin electronic components and technology to Iran, including electronic components with drone applications, through his co-defendant, Abedini.  Sadeghi did this by helping Abedini set up a front company in Switzerland and vouching for Abedini with Sadeghi's own employer.  Sadeghi did all this despite knowing about Abedini's association with SDRA and the Iranian government.  The current charges are serious and life-altering for Sadeghi.  His professional future in the United States is limited. Sadeghi has both the connections and the resources to relocate to Iran, where members of his immediate family still reside and where his co-defendant (Abedini) or any other number of prominent connections can provide lucrative employment.  Sadeghi's connections to Iran have endured over the years and he has traveled to Iran on a regular basis since relocating to the United States.  If he flees, Sadeghi will be beyond the jurisdiction of this Court because the United States does not have an extradition treaty with Iran.

The conditions of release do not meaningfully address these risks, let alone mitigate them. The secured bond on Sadeghi's primary residence is modest, both in terms of the overall resources

available to him and the additional resources that the Iranian government would provide if he repatriated to avoid justice.  While home confinement and electronic monitoring would mitigate concerns regarding potential danger, as to the risk of flight, such conditions would merely provide the government with historical notice of what has already happened.  To the extent that Sadeghi and his family might need new passports to travel, the Iranian government can simply mail them new passports or facilitate hand delivery through any number of people in Sadeghi's orbit who routinely travel back and forth to Iran.[6]

Simply put, if Sadeghi is released there is no set of conditions that can reasonably assure his future appearance and the factors under the bail reform act weigh in favor of detention.  *See United States v. Townsend*, 897 F.2d 989, 994-95 (9th Cir. 1990) (denying bail to defendants charged with export violations where defendants faced substantial sentences, had extensive foreign ties, engaged in "sophisticated criminal conduct," could "adapt easily to foreign countries" and where the nature of the crime made it possible that other countries would "provide a haven" for such a defendant who jumped bail).

1.   The Nature and Circumstances of the Offense

The offense in this case is serious and weighs in favor of detention.  IEEPA is statute that authorizes the President to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, 50 U.S.C. § 1702.  Indeed, with respect to Iran, "[t]he United States has imposed economic sanctions and

---

[6] This is particularly true in light of Sadeghi's knowledge and use of informal financial networks, as discussed in greater detail in the government's supplemental memorandum in support of detention.  Doc. 37.

regulations to help ensure that the Government of Iran and Iranian companies do no harm to the United States." *See United States v. Zarrab*, No. 15-Cr.-867 (RMB), 2016 WL 3681423, at *3 (S.D.N.Y. June 16, 2016). Here, Sadeghi willfully and repeatedly disregarded the national security interests of the United States, thereby causing precisely the type of harm that IEEPA was designed to prevent.

Specifically, Sadeghi facilitated the illegal transfer of sensitive U.S.-origin goods and technology to Abedini who supplied the IRGC—a foreign terrorist organization—with the technology that would allow the IRGC's one-way attack drones to reach their intended targets. Sadeghi is a sophisticated engineer who worked for the very company whose electronic components and non-public technology he provided to Abedini, and he would have understood their military applications and their significance to Abedini and to SDRA. That Sadeghi understood that fact was further made clear when Sadeghi sent a colleague a CNN article that specifically discussed the use of U.S.-origin electronic components, including U.S. Company 1 electronic components, in Iranian drones. Doc. 28-2 at ¶ 6(a). Sadeghi sent the article in 2023, which was after Sadeghi facilitated Abedini and Illumove's contract with U.S. Company 1, and during the period in which Sadeghi knew that Abedini was continuing to obtain sensitive U.S. Company 1 electronic components and technology while in Iran.

Nevertheless, Sadeghi continued to illegally transfer and to facilitate the transfer of U.S. Company 1 goods and technology—including electronic components that have drone applications—to Abedini and to SDRA in Iran. Thus, through his egregious actions over the course of multiple years, Sadeghi not only directly violated U.S. sanctions on Iran—including through deception during the course of his employment—but in so doing, directly and knowingly harmed the national security of the United States by facilitating Abedini's and SDRA's access to

sensitive U.S. technology.

Sadeghi faces a significant term of imprisonment—up to 20 years of imprisonment for each of the charged violations of IEEPA—upon conviction, and which provides Sadeghi additional incentive to flee. Courts have repeatedly held that with serious charges and the possibility of considerable punishment comes a substantial incentive to flee the United States. *See Zarrab*, 2016 WL 3681423, at *3; *Jam*, 2:20-Cr.-20550-01-SJM-RSW, ECF No. 34 at 3 ("The nature and circumstances of the offense are unquestionably serious. Defendant is charged with conspiring to violate international sanctions and secure goods to send to Iran."); *United States v. Gray*, 529 F. Supp. 2d 177, 182 (D. Mass. 2007) (finding that the defendant posed a risk of flight because, inter alia, he faced a "formidable maximum sentence of ten years imprisonment and $250,000 in fines"); *see also United States v. Vick*, No. 128-10126-ADB, 2017 WL 773860, at *3 (D. Mass. Feb. 28, 2017) (finding that a 41-53 month sentence on the heels of a previously served 18 month sentence would create a significant incentive to flee).

Sadeghi has little incentive to appear before this Court and to submit to the jurisdiction of the United States. Accordingly, this factor weighs heavily in favor of the Government's motion to revoke the release order.

2. The Weight of the Evidence

The Court must also consider the weight of the evidence when weighing the risk that the defendant will flee, because where "the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight. *United States v. Zhang*, 55 F.4th 141, 151 (2d Cir. 2022). To establish a violation of the IEEPA conspiracy alleged in Count One, the government must prove that the conspiracy alleged in Count One existed and that that Sadeghi knowingly and voluntarily

12

joined in that agreement. *See United States v. Perez-Gonzalez*, 445 F.3d 39, 49 (1st Cir. 2006). To establish a substantive IEEPA violation, the government must establish: (1) the defendant exported, reexported, sold, or supplied – or caused the export, reexport, sale, or supply of – a good, service, or technology ("an item"); (2) either the defendant was a U.S. person, or the item was from the United States; (3) the item went directly or indirectly to Iran, or to a third country with the defendant's knowledge that the item was intended specifically for supply, transshipment, or reexportation to Iran; (4) the defendant did not obtain a license from OFAC; and (5) the defendant acted knowingly and willfully. *Cf. United States v. Mousavi*, 604 F.3d 1084, 1090-1091 (9th Cir. 2010) (discussing elements).

The evidence against Sadeghi as to each element is overwhelming. As described in the criminal complaint, and summarized above, Sadeghi has been sending U.S. goods and technology to Abedini for years, long before Illumove was established in 2019. (Doc. 28-1 at ¶¶ 46-50). Mere months after being hired by U.S. Company 1, a global semi-conductor company, Sadeghi was already helping to backstop Abedini's front company in Switzerland and introducing him to his contacts at U.S. Company 1. Doc. 28-1 at ¶¶ 60-66. Sadeghi did all of this despite knowing about U.S. sanctions, which is why, when confronted by U.S. Customs and Border Protection ("CBP") about his business in August 2024, Sadeghi lied, falsely stating that he had never done business with the Iranian government or with anyone in Iran. Doc. 28-1 at ¶¶ 88.

Importantly, the current charges against Sadeghi do not require the government to prove Sadeghi's knowledge regarding Abedini's connection to the Iranian military, the relationship between SDRA and the IRGC, or that Sadeghi specifically intended to provide assistance to the Iranian drone program (despite working onsite at SDRA on multiple occasions when he was in Iran). The U.S. sanctions against Iran prohibit the export of goods, services, and technology to

13

Iran without a license, regardless of whether the commodity is sensitive or subject to other export controls. Thus, the government need only prove that Sadeghi acted willfully; the government has ample facts to do so. That the circumstances of Sadeghi's conduct had such grave consequences— and that Sadeghi engaged in precisely the kind of activity impacting U.S. national security that IEEPA is designed to prevent—is relevant to punishment, not guilt.

The evidence that Sadeghi engaged in conduct prohibited by IEEPA is overwhelming and weighs heavily in favor of detention. *See United States v. McForbes*, 109 F. Supp. 3d 365, 367-68 (D. Mass. 2015) ("Questions about evidentiary weight as it bears on the question of guilt beyond a reasonable doubt will be properly determined by the jury. For instant purposes, it suffices to say that the evidence against this defendant is significant and weighs in favor of detention under 18 U.S.C. § 3142(g)(2).).

3.  The History and Characteristics of the Defendant

Sadeghi's history and characteristics establish that, in light of the charges, he has every reason to return with his family to Iran rather than voluntarily appear at future court proceedings.

First, Sadeghi likely has limited remaining prospects for his chosen livelihood in the United States. After the charges in this case were filed, Sadeghi was fired from his employer, U.S. Company 1. Despite being a highly trained engineer with specialized experience in navigation systems, it is unlikely—in light of the serious national security charges he is facing— that he will be able to find a job in his chosen field within the United States. In Iran, however, Sadeghi has a future. Sadeghi has maintained professional connections with INEF, *see* Doc. 28-2 at ¶ 6(b)-(d), the Iranian governmental organization that originally recognized Sadeghi's promise and provided funding for Iranian Company 1. *Id.* at ¶ 36. Sadeghi also has enduring ties with Abedini and other high-level officials at SDRA *see* Doc. 28-2 at ¶6(e)—all of whom have their own significant

14

connections to the Iranian government—that could provide him with a substantial employment advantage when he returns to Iran. But perhaps most significantly, in Iran, Sadeghi's violations of U.S. sanctions—violations that directly or indirectly aided the government of Iran—would be celebrated, not punished. Once Sadeghi has come to terms with the strength of the government's evidence and begins to understand the significant penalties he faces here as compared to the significant benefits that could be available to him in Iran, he will have every reason to flee.

Should Sadeghi return to Iran, he has a significant support network already there. Sadeghi was born in Iran and lived in Iran until 2007. Doc. 28-1 at ¶ 34. He was educated in Iran. *Id.* His family resides in Iran, and Sadeghi regularly travels to Iran for weeks at a time. *Id.*; *see also* Doc. 28-2 at ¶ 7. Moreover, his wife and children have Iranian citizenship, which removes a significant barrier to his departure.[7] To the extent Sadeghi claims his network in the United States is greater than that in Iran, such claims are not credible, given his deep personal and professional ties to Iran.

Although Sadeghi has no prior history of failing to appear and no prior criminal history, as discussed above, the charges he is facing in *this* case are incredibly serious, and he has both the incentive and the means to flee. Although letters of support from his local community suggest that Sadeghi does have friends in the United States, those letters do not minimize or account for the significant connections that Sadeghi also has in Iran, including his mother, father, and multiple siblings, nor do they suggest that—in light of the significant crimes that Sadeghi is charged with— his U.S. support is unwavering. Indeed, prior to learning that he was conspiring with an individual who is accused of providing material support to a foreign terrorist organization, many of Sadeghi's

---

[7] Although Sadeghi's wife and children have also relinquished their passports, for the same reasons as discussed above, there are myriad ways that the Iranian government could facilitate the transfer of new passports to Sadeghi's family members.

coworkers at U.S. Company 1 may have similarly praised Sadeghi. That they are now silent in light of the charges against Sadeghi is foretelling.

Finally, if—in light of his brighter future in Iran—Sadeghi were to flee to Iran, or a country friendly with Iran, he could remain outside the reach of this Court indefinitely. *See United States v. Butina*, No. 18-00218 (D.D.C. July 24, 2018) ECF No. 15 at 6 ("A defendant's citizenship of a country with which the United States has no extradition treaty is a factor relevant to an assessment of the defendant's history and characteristics."); *see also United States v. Acherman*, No. 15-10046-LTS, 2015 WL 4576926, at *2 (D. Mass. July 30, 2015) (considering in its risk of flight analysis that the defendant was a citizen of Venezuela, which bars the extradition of its own citizens); *United States v. Amar*, 300 F. Supp. 3d 287, 289 (D.D.C. 2018) (finding that a defendant who was a citizen of a country with which the United States had no extradition treaty had a "plausible destination to which to flee"); *United States v. Tajideen*, No. CR 17-46 (RBW), 2018 WL 1342475, at *7 (D.D.C. Mar. 15, 2018), aff'd, 724 F. App'x 6 (D.C. Cir. 2018) (considering the defendant's foreign citizenship, including "citizenship in a country that does not have an extradition agreement[] with the United States" as a factor weighing in favor of detention); *see also United States v. Ho*, No. 3:16-CR-46-TAV-HBG-1, 2016 WL 5875005, at *6 (E.D. Tenn. Oct. 7, 2016), aff'd, 2016 WL 10077327 (6th Cir. Dec. 9, 2016) (defendant's citizenship of a country with which the United States had no extradition treaty warrants the conclusion that "the United States cannot procure [the defendant's] return[,] . . . suggest[ing] opportunities for flight.") (citation omitted).

For each of the above reasons, the history and characteristics of the defendant support Sadeghi's continued detention.

16

4.   <u>The Nature and Seriousness of the Danger Presented by Release</u>

The government concedes that Sadeghi does not pose an immediate physical danger to the community if released.  If he were to flee to Iran, the government would have significant safety concerns for U.S. national security given Sadeghi's chosen profession and ties to Abedini.

**CONCLUSION**

The facts set forth herein and at the detention hearing establish by a fair preponderance of the evidence that the defendant is a serious flight risk.  Because there are no conditions or combination of conditions that could reasonably assure his appearance at future court proceedings, the government requests that this court revoke the magistrate judge's order of release and order the defendant held pending trial.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:  /s/ Jared C. Dolan
JARED C. DOLAN
ALATHEA E. PORTER
Assistant United States Attorneys

CHRISTINA A. CLARK
Trial Attorney
National Security Division
United States Department of Justice

Date: March 27, 2025

17

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Jared C. Dolan
Dated: March 27, 2025                                      Assistant United States Attorney

18