UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>           v.<br><br>(1) MAHDI MOHAMMAD SADEGHI,<br>     a/k/a MOHAMMAD MAHDI<br>     SADEGHI, and<br>(2) MOHAMMAD<br>     ABEDININAJAFABADI, a/k/a<br>     "MOHAMMAD ABEDINI,"<br><br>                     Defendants. | No. 1:24-CR-10391-IT |

**<u>GOVERNMENT'S RESPONSE TO
MOTION TO DISMISS COUNTS 2–4</u>**

**Table of Contents**

Table of Authorities ...................................................................................................... iii

I.      Introduction ........................................................................................................ 1

II.     Background ......................................................................................................... 2

        A.      The indictment's allegations ................................................................... 2

        B.      Legal background .................................................................................... 4

                1.      IEEPA and the ITSR ................................................................... 4

                2.      The Berman Amendment ............................................................. 6

III.    Legal Standard ................................................................................................... 8

IV.     Argument ............................................................................................................ 9

        A.      The indictment adequately alleges an export of technology in violation of the
                ITSR and IEEPA ..................................................................................... 9

        B.      IEEPA and the ITSR are not unconstitutionally vague ......................... 14

        C.      IEEPA and the ITSR are valid under the First Amendment ................. 17

        D.      IEEPA is not an unconstitutional delegation of power ......................... 21

V.      Conclusion ....................................................................................................... 24

# Table of Authorities

**Cases**

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998)................................................................12, 13

*Bates v. United States,*
    522 U.S. 23 (1997)........................................................................12

*Boyce Motor Lines v. United States,*
    342 U.S. 337 (1952)..............................................................9, 17, 21

*Burson v. Freeman,*
    504 U.S. 191 (1992)......................................................................20

*Cernuda v. Heavey,*
    720 F. Supp. 1544 (S.D. Fla. 1989)..............................................7

*Chapman v. United States,*
    500 U.S. 453 (1991)......................................................................17

*City of Austin, Texas v. Reagan National Advertising of Austin, LLC,*
    596 U.S. 61 (2022)..................................................................18, 19

*Colautti v. Franklin,*
    439 U.S. 379 (1979)......................................................................17

*Federal Communications Commission v. Consumers' Research,*
    145 S. Ct. 2482 (2025)................................................................21

*Federal Power Commission v. Hope Natural Gas Co.,*
    320 U.S. 591 (1944)......................................................................22

*Free Speech Coalition, Inc. v. Paxton,*
    606 U.S. 461 (2025)......................................................................18

*Gundy v. United States,*
    588 U.S. 128 (2019)......................................................................21

*Humanitarian Law Project v. U.S. Treasury Department,*
    578 F.3d 1133 (9th Cir. 2009) ..............................................16, 18

*Kolender v. Lawson,*
    461 U.S. 352 (1983)......................................................................14

*Lichter v. United States,*
    334 U.S. 742 (1948)......................................................................22

*National Broadcasting Co. v. United States,*
    319 U.S. 190 (1943)..................................................................................21

*Rose v. Locke,*
    423 U.S. 48 (1975)...................................................................................14

*Reed v. Town of Gilbert, Arizona,*
    576 U.S. 155 (2015)............................................................................18, 19

*Stagg P.C. v. U.S. Department of State,*
    673 F. App'x 93 (2d Cir. 2016) ..............................................................20

*United States v. Amirnazmi,*
    645 F.3d 564 (3d Cir. 2011) .............................................14, 16, 21, 22, 23

*United States v. Anvari-Hamedani,*
    378 F. Supp. 2d 821 (N.D. Ohio 2005) ..................................................14

*United States v. Arch Trading Co.,*
    987 F.2d 1087 (4th Cir. 1993) ...........................................................21, 23

*United States v. Chi Mak,*
    683 F.3d 1126 (9th Cir. 2012) ................................................................19

*United States v. Dhafir,*
    461 F.3d 211 (2d Cir. 2006) ..........................................................21, 22, 23

*United States v. Ehsan,*
    163 F.3d 855 (4th Cir. 1998) ...........................................................14, 17, 20

*United States v. Facteau,*
    89 F.4th 1 (1st Cir. 2023) .......................................................................15

*United States v. Guerrier,*
    669 F.3d 1 (1st Cir. 2011)...............................................................9, 10, 11

*United States v. Hescorp, Heavy Equipment Sales Corp.,*
    801 F.2d 70 (2d Cir. 1986) .....................................................................14

*United States v. Marbelt,*
    129 F. Supp. 2d 49 (D. Mass. 2000) .......................................................9

*United States v. Mirza,*
    454 F. App'x 249 (5th Cir. 2011) ...........................................................21

*United States v. Nachef,*
    No. 97-cr-10141, 1998 WL 151270 (D. Mass. Mar. 20, 1998) ................9

*United States v. O'Brien*,
    391 U.S. 367 (1968)......................................................................18

*United States v. Posey*,
    864 F.2d 1487 (9th Cir. 1989).......................................................20

*United States v. Quinn*,
    401 F. Supp. 2d 80 (D.D.C. 2005) ...............................................14

*United States v. Ragen*,
    314 U.S. 513 (1942)......................................................................17

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023)...........................................13, 14, 21

*United States v. Soussi*,
    316 F.3d 1095 (10th Cir. 2002).....................................................14

*United States v. Vaghari*,
    No. 08-cr-693, 2009 WL 2245097 (E.D. Pa. July 27, 2009) ........14

*United States v. Wells*,
    766 F.2d 12 (1st Cir. 1985) .......................................................9, 10

*United States v. Zarrab*,
    No. 15-cr-867, 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ......20

*United States v. Zhen Zhou Wu*,
    711 F.3d 1 (1st Cir. 2013).............................................................17

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................20

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001)......................................................................22

*Yakus v. United States*,
    321 U.S. 414 (1944)......................................................................22

*Zemel v. Rusk*,
    381 U.S. 1 (1965)..........................................................................22

**Statutes, Regulations, and Rules**

50 U.S.C. § 1622...............................................................................23

50 U.S.C. § 1701.........................................................................22, 23

50 U.S.C. § 1702 .................................................................................... passim

50 U.S.C. § 1703 .................................................................................... 23

50 U.S.C. § 1704 .................................................................................... 4

50 U.S.C. § 1705 .................................................................................... passim

50 U.S.C. § 1706 .................................................................................... 23

50 U.S.C. § 4604 .................................................................................... 7

50 U.S.C. § 4605 .................................................................................... 7

15 C.F.R. § 734.7 .......................................................................... 6, 15, 19, 20

15 C.F.R. § 746.7 .................................................................................... 6

15 C.F.R. § 772.1 .......................................................................... 6, 15, 19

31 C.F.R. § 560.203 ...................................................................... 11, 15, 19

31 C.F.R. § 560.204 .................................................................................. passim

31 C.F.R. § 560.205 ...................................................................... 11, 15, 19

31 C.F.R. § 560.206 .............................................................. 5, 11, 13, 15, 19

31 C.F.R. § 560.210 .................................................................................. 8, 13

31 C.F.R. § 560.315 .......................................................................... 8, 11, 14

31 C.F.R. § 560.418 .......................................................................... 5, 15

Federal Rule of Criminal Procedure 12 ................................................ 8

## Other Authorities

132 Cong. Rec. 6550 ............................................................................... 7

H.R. Rep. No. 100-40, Part 3 ................................................................ 8

H.R. Conf. Rep. No. 100-576, 1988 U.S.C.C.A.N. 1547 ....................... 8

Executive Order No. 12,170, 44 Fed. Reg. 65729 ................................ 4

Executive Order No. 12,957, 60 Fed. Reg. 14615 ................................ 4

Executive Order No. 12,959, 60 Fed. Reg. 24757 ................................ 4

Executive Order No. 13,059, 62 Fed. Reg. 44531 ..........................................................4

First Circuit Pattern Criminal Jury Instructions § 2.17.............................................17

Office of Foreign Assets Control Compliance Hotline................................................16

U.S. Department of Commerce Bureau of Industry and Security, SNAP-R ..............16

*Technology*, Black's Law Dictionary ..........................................................................5

*Technology*, Merriam-Webster.com ...........................................................................5

# I.    Introduction

The indictment in this case alleges that for nearly a decade, defendant Mahdi Mohammad Sadeghi — who, at the time of his arrest, was an engineer for a Massachusetts-based global semiconductor manufacturer — devised a scheme to provide export-controlled U.S. electronic components and proprietary information to an Iranian company called San'at Danesh Rahpooyan Aflak Co., or SDRA. SDRA manufactures navigation systems and software used in drones and missiles and is a longtime supplier for the Islamic Revolutionary Guard Corps Aerospace Force, a sanctioned Iranian government agency that operates Iran's drone fleet. As part of the alleged scheme, on three occasions Sadeghi sent his employer's draft datasheets — which were not public and which detailed the technical performance and characteristics of unreleased electronic components developed by his employer for use in navigation systems — to his co-conspirator, an Iranian national and SDRA's managing director, who then transferred them to SDRA. Counts 2–4 allege that this conduct violated the Iranian Transactions and Sanctions Regulations (the ITSR), which prohibit exporting "any goods, technology, or services" to Iran without a license from the Treasury Department's Office of Foreign Assets Control (OFAC), and the International Economic Emergency Powers Act (IEEPA), which criminalizes willful violations of the ITSR.

Sadeghi has moved to dismiss these counts. His primary claim is that the unpublished datasheets constitute not technology, as alleged in the indictment, but information, and under a provision of IEEPA known as the Berman Amendment, the government cannot regulate or prohibit "the exportation … of any information or informational materials." That claim, however, improperly invites the Court to weigh evidence and make findings about the datasheets inconsistent with the indictment's allegations. Here, the indictment alleges that the datasheets constitute technology whose export to Iran was prohibited under the ITSR. That allegation, which must be taken as true on this motion to dismiss, is sufficient to render the indictment

1

facially valid. And while not properly before the Court at this stage, Sadeghi's claim also overlooks the next sentence of the Berman Amendment — nowhere mentioned in Sadeghi's brief — which says the government **can** regulate and prohibit exports of items subject to Commerce Department export controls, like the unpublished draft datasheets here.

Sadeghi's challenges to the IEEPA and ITSR provisions underlying Counts 2–4 on grounds of vagueness, the First Amendment, and the nondelegation doctrine also fail. The elements of the ITSR provisions, coupled with IEEPA's high mens rea requirement, provide fair notice and ascertainable limits on what conduct is covered, as courts have uniformly concluded. To the extent the ITSR cover any expressive conduct, they do so without regard to content or viewpoint, so they are subject only to — and readily satisfy — intermediate First Amendment scrutiny. And IEEPA supplies an intelligible principle to guide the executive branch in exercising the authority conveyed under the statute, as every circuit to have considered the issue has held.

The motion to dismiss Counts 2–4 should be denied.

## II.    Background

### A.    The indictment's allegations

The indictment alleges that Sadeghi, a U.S. citizen who worked as an engineer for a global semiconductor manufacturer (U.S. Company 1), created a business proposal for an Iranian governmental organization. Indictment ¶¶ 1, 3, Doc. No. 14 at 1–2. Under the proposal, Sadeghi sought $790,000 in funding from the Iranian governmental organization in return for creating a company in Iran whose "IRAN Benefits" would include intellectual property, knowledge transfer, and capability development. *Id.* ¶¶ 3–4. Sadeghi presented the proposal in person in Iran to the Iranian government organization, which provided a portion of the requested funding. *Id.* ¶ 4.

On behalf of the new Iranian company he had created under the proposal, Sadeghi entered into a contract with SDRA, an Iranian company that designed and made a proprietary navigation system with applications in drones and missiles. *Id.* ¶¶ 6–7. One of SDRA's customers for the navigation system was the Islamic Revolutionary Guard Corps (IRGC) Aerospace Force, the primary operator of Iran's drone fleet. *Id.* ¶ 8. The IRGC has been designated by the Treasury Department as a Specially Designated National for its role in Iran's weapons of mass destruction program and a Specially Designated Global Terrorist for its role in supporting terrorist activities. *Id.* ¶ 9. The IRGC has also been designated by the State Department as a Foreign Terrorist Organization for its involvement in terrorist activities and hostage taking. *Id.* ¶ 10. The IRGC's lethal drones, including those using SDRA's navigation system, have been used to kill civilians and U.S. service members. *Id.* ¶¶ 12–13.

Sadeghi is charged with conspiring to export U.S. goods, technology, and services to Iran without a license from OFAC in violation of IEEPA and the ITSR. *Id.* ¶¶ 22, 27.

In addition to the IEEPA conspiracy, Sadeghi is also charged with three substantive IEEPA offenses in Counts 2–4. Specifically, the indictment alleges that Sadeghi "did knowingly and willfully export, … supply, and cause the exportation … and supply of technology from the United States and by a U.S. person to Iran … without … a license." *Id.* ¶ 29. The indictment alleges that Sadeghi did so on three occasions by "transferr[ing] … U.S. Company 1 draft datasheets, which had not yet been publicly released," to his co-conspirator, an Iranian national and the co-founder and managing director of SDRA, who transferred them to SDRA in Iran. *Id.* ¶¶ 5, 23(n), 29. The indictment alleges that the draft datasheets "were not yet publicly available" and "discussed the technical performance and characteristics of U.S. Company 1's electronic

components" — including for components with applications in drone navigation systems.[1] *Id.*
¶ 23(n).

**B.    Legal background**

**1.    IEEPA and the ITSR**

IEEPA authorizes the President, after declaring a national emergency, to:

> regulate, … prevent or prohibit, any … use[ or] transfer … of, or
> dealing in, … or transactions involving, any property in which any
> foreign country or a national thereof has any interest[,] by any
> person, or with respect to any property, subject to the jurisdiction
> of the United States.

50 U.S.C. § 1702(a)(1)(B). IEEPA also authorizes the President to issue regulations, "including
regulations prescribing definitions," to carry out his authority under the statute. 50 U.S.C.
§ 1704. IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate,
or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50
U.S.C. § 1705(a). Willful violations are a felony. 50 U.S.C. § 1705(c).

Beginning in 1979 and continued by every subsequent administration, the President has
declared a national emergency with respect to Iran. Exec. Order No. 12,170, 44 Fed. Reg. 65729
(Nov. 15, 1979). In 1995 and 1997, the President exercised his statutory authority under IEEPA
to prohibit the export or sale, directly or indirectly, of any goods, technology, or services from
the United States or by a U.S. person, wherever located, to Iran. Exec. Order No. 12,957, 60 Fed.
Reg. 14615 (Mar. 17, 1995); Exec. Order No. 12,959, 60 Fed. Reg. 24757 (May 9, 1995); Exec.
Order No. 13,059, 62 Fed. Reg. 44531 (Aug. 21, 1997). To carry out these Executive Orders, the

---

[1]      Sadeghi's fugitive co-defendant is charged with these same four IEEPA offenses, as well
as additional IEEPA offenses and substantive and conspiracy counts of providing material
support to a foreign terrorist organization resulting in death. Indictment ¶¶ 30–41, Doc. No. 14 at
16–23.

President authorized the Treasury Department to promulgate regulations and to use all powers granted to him under IEEPA.

Under this authority, the Treasury Department promulgated regulations now known as the Iranian Transactions and Sanctions Regulations, or the ITSR. *See* 31 C.F.R. Part 560. The ITSR prohibit "the exportation … or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran" without authorization from OFAC in the form of a license. 31 C.F.R. § 560.204. The ITSR also say that "no United States person, wherever located, may engage in any transaction or dealing in or related to … [g]oods, technology, or services for exportation … or supply, directly or indirectly, to Iran" without a license. 31 C.F.R. § 560.206(a).

Although the ITSR do not independently define "technology," the standard definition of that term is "the practical application of knowledge especially in a particular area" or "a capability given by the practical application of knowledge." *Technology*, Merriam-Webster.com; *see also Technology*, Black's Law Dictionary (12th ed. 2024) ("[m]odern equipment, machines, and methods based on contemporary knowledge of science and computers"). Also, a note to another ITSR provision indicates that the meaning of technology in the ITSR is informed by the definition of that term in Commerce Department export regulations. *See* 31 C.F.R. § 560.418 note 1 ("The release of technology or software in the United States, or the release of U.S. origin technology or software in a third country, to a foreign national may require a license from the U.S. Department of Commerce's Bureau of Industry and Security under the Export Administration Regulations, 15 CFR parts 730 through 774 (the 'EAR'). The EAR require a license for such release if [certain] conditions are met …."). These Commerce Department regulations define technology as "[i]nformation necessary for the development, production, use,

operation, installation, maintenance, repair, overhaul, or refurbishing (or other terms specified in [Export Control Classification Number]s on the [Commerce Control List] that control 'technology') of an item." 15 C.F.R. § 772.1 (internal quotation marks omitted). These regulations note that technology "may be in any tangible or intangible form, such as written or oral communications, blueprints, drawings, photographs, plans, diagrams, models, formulae, tables, engineering designs and specifications, computer-aided design files, manuals or documentation, electronic media or information revealed through visual inspection." 15 C.F.R. § 772.1 note 1 to definition of Technology. The regulations further say that, in general, "'technology' … is 'published,' and is thus not 'technology' … subject to the EAR, when it has been made available to the public without restrictions upon its further dissemination."[2] 15 C.F.R. § 734.7(a).

### 2.    The Berman Amendment

In response to seizures of inbound shipments of magazines and books from embargoed countries, Congress amended IEEPA's grant of authority to the President in 1988. Commonly called the Berman Amendment after the legislation's sponsor, Rep. Howard Berman, this exemption provides:

> The authority granted to the President by this section does not
> include the authority to regulate or prohibit, directly or
> indirectly —
>
> …

---

[2]    The Commerce Department regulations have a specific provision about exports to Iran. It says: "No person may export or reexport any item that is subject to the EAR if such transaction is prohibited by the [ITSR] and not authorized by OFAC." 15 C.F.R. § 746.7(e). The provision also says: "To avoid duplication, exporters … are not required to seek separate authorization from [the Commerce Department] for an export … subject both to the EAR and to OFAC's [ITSR]. Therefore, if OFAC authorizes an export …, such authorization is considered authorization for purposes of the EAR as well." 15 C.F.R. § 746.7(a)(2).

> the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. …

50 U.S.C. § 1702(b)(3). The general purpose of the Berman Amendment is to protect "the free exchange of ideas across international frontiers." 132 Cong. Rec. 6550, 6550 (1986); *see also Cernuda v. Heavey*, 720 F. Supp. 1544, 1547–48 (S.D. Fla. 1989) (noting that the Berman Amendment "specifically provides that the legislative history for the predecessor bill … generally is treated as its own legislative history").

However, recognizing the concerning implications of allowing the export of any material that could be deemed informational, Congress in the next sentence of the statute limited the scope of the Berman Amendment's exemption in the context of exports:

> The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 4604 of this title, or under section 4605 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States ….

50 U.S.C. § 1702(b)(3). The cross-referenced statutes — 50 U.S.C. § 4604 (concerning export controls for national security reasons) and § 4605 (concerning export controls to further U.S. foreign policy or fulfill international obligations) — were part of the Export Administration Act of 1979 (the EAA), which Congress later replaced with the Export Control Reform Act of 2018 (ECRA). Those statutes authorize the Commerce Department to promulgate export control regulations for certain "dual-use" items — items that have both civilian and military uses. These Commerce Department regulations, known as the Export Administration Regulations or EAR, are codified in Parts 730–774 of Title 15 of the Code of Federal Regulations. As the conference report explained, under the Berman Amendment, IEEPA "do[es] not authorize regulations on the

export … of informational material **not otherwise controlled under the Export Administration Act**." H.R. Conf. Rep. No. 100-576, at 839 (1988) (emphasis added), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1872; *see also* H.R. Rep. No. 100-40, pt. 3, at 113 (Apr. 6, 1987) (explaining that Berman Amendment "clarif[ies] that the authority granted to the President by [IEEPA] does not include the authority to regulate … exports … of informational materials, **which are not otherwise under National Security export controls under section 5 of the Export Administration Act of 1979**" (emphasis added)). Thus, under this carveout to the Berman Amendment, IEEPA **does** allow the President to regulate and prohibit exports of items — including informational materials — that are subject to these Commerce Department export controls.

The ITSR incorporate the Berman Amendment's exemption. 31 C.F.R. § 560.210(c)(1) ("The prohibitions contained in this part do not apply to the importation from any country and the exportation to any country of information or informational materials …, whether commercial or otherwise, regardless of format or medium of transmission."). The ITSR also incorporate the Berman Amendment's carveout for exports of items subject to Commerce Department export controls. 31 C.F.R. § 560.315(b) ("The term *information or informational materials,* with respect to exports, does not include items … [t]hat were, as of April 30, 1994, or that thereafter become, controlled for export pursuant to section 5 of the Export Administration Act of 1979 (50 U.S.C. App. 2401–2420, the 'EAA'), or section 6 of the EAA to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States.").

## III.    Legal Standard

Federal Rule of Criminal Procedure 12(b) says "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." On a motion to dismiss an indictment, "the allegations of the indictment must be taken as true."

*Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952). "A motion to dismiss an indictment is not a device for summary trial of the evidence, but rather is directed only to the question of the validity of the indictment on its face." *United States v. Marbelt*, 129 F. Supp. 2d 49, 56 (D. Mass. 2000) (citation omitted). An indictment is facially valid "if it describes all of the elements of the charged offense using the words of the relevant criminal statute." *United States v. Wells*, 766 F.2d 12, 22 (1st Cir. 1985).

Applying this rule, "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations," which would invade the grand jury's constitutional role and cause unnecessary delay. *United States v. Guerrier*, 669 F.3d 1, 3–4 (1st Cir. 2011). "There is simply no equivalent in criminal law to summary judgment, and a facially valid indictment is all that is needed to proceed to trial." *United States v. Nachef*, No. 97-cr-10141, 1998 WL 151270, at *3 (D. Mass. Mar. 20, 1998).

## IV.    Argument

### A.    The indictment adequately alleges an export of technology in violation of the ITSR and IEEPA

Sadeghi's primary contention is that Counts 2–4 of the indictment fail to allege IEEPA and ITSR offenses because the Berman Amendment exempts from IEEPA "informational materials" like the unpublished draft datasheets he allegedly exported to Iran. Mot. to Dismiss, Doc. No. 131 at 12–14, 16–20. That contention ignores the settled standard governing motions to dismiss, misreads the plain language of the Berman Amendment, and misconstrues the elements of an IEEPA and ITSR offense. The indictment properly alleges all the necessary elements of the offense, which is all that is required at this stage.

Counts 2–4 allege that Sadeghi "did knowingly and willfully export, … supply, and cause the exportation … and supply of **technology** from the United States and by a U.S. person to

Iran … without … a license." Indictment ¶ 29, Doc. No. 14 at 15 (emphasis added). The

indictment alleges that Sadeghi did so by "transferr[ing] … U.S. Company 1 draft datasheets,

which had not yet been publicly released," to his co-conspirator, an Iranian national, who

transferred them to SDRA, an Iranian company. *Id.* ¶ 29; *see also id.* ¶ 23(n). Those allegations,

which must be taken as true on this motion to dismiss, faithfully track the ITSR, which prohibit

"the exportation … or supply, directly or indirectly, from the United States, or by a United States

person, wherever located, of any goods, **technology**, or services to Iran" without a license. 31

C.F.R. § 560.204 (emphasis added). In turn, IEEPA makes it "unlawful for a person to violate …

or cause a violation of any … regulation … issued under this chapter." 50 U.S.C. § 1705(a).

Because the indictment alleges the elements of the charged offense using the words of the ITSR

and IEEPA, it is facially valid and not subject to dismissal. *See United States v. Wells*, 766 F.2d

12, 22 (1st Cir. 1985).

Sadeghi asserts that the unpublished draft datasheets underlying Counts 2–4 are not

technology but instead informational materials under the Berman Amendment. Doc. No. 131 at

12–13, 17–18. That assertion is based on his own ipse dixit about datasheets in the abstract, as

well as descriptions of other publicly available datasheets in unpublished out-of-circuit cases

(though not the actual non-public draft datasheets he is charged with exporting).[3] Doc. No. 131

at 12–13, 17–18. Contrary to Sadeghi's suggestion, these extrinsic sources cannot be credited

over the indictment's allegations, which are what must be taken as true on this motion to dismiss.

*See United States v. Guerrier*, 669 F.3d 1, 3–4 (1st Cir. 2011). The indictment alleges that the

---

[3]     Notably, even the two sample ADI datasheets cited by Sadeghi — which are public, unlike the draft datasheets underlying Counts 2–4 — are each over 40 pages of dense engineering specifications, performance characteristics, and diagrams. *See* Doc. No. 131 at 15 n.2. It is not hard to see that they satisfy any common definition of "technology."

unpublished draft datasheets constitute technology, which is all that is necessary to survive a motion to dismiss for failure to state an offense.

While not before the Court at the motion-to-dismiss stage, the government notes that at trial it will present competent evidence proving that the draft datasheets that Sadeghi transferred constitute technology under the ITSR. The government anticipates that this evidence will include testimony that the datasheets were not public and were necessary to, among other things, use and install the electronic components at issue. This evidence will show that the draft datasheets contained the detailed technical performance and characteristics of U.S. Company 1's unreleased electronic components, illustrating the key strategic advantages that the draft datasheets gave SDRA. In addition, the government expects to present evidence that the draft datasheets were controlled for export by the Commerce Department under the EAR and that a license was required to export them to Iran. Together, this evidence will establish that the draft datasheets constitute technology whose export to Iran is prohibited by the ITSR (31 C.F.R. §§ 560.203– 560.206) and IEEPA (50 U.S.C. § 1705(a)), not informational materials exempted under the Berman Amendment (50 U.S.C. § 1702(b)(3)) and corresponding ITSR provision (31 C.F.R. § 560.315(b)).[4] Ultimately, however, consideration of this evidence is reserved for trial; the Court cannot wade into its sufficiency on a motion to dismiss. *Guerrier*, 669 F.3d at 4.

Sadeghi also contends that "technology" is by definition "information," and thus all technology is exempt from IEEPA under the Berman Amendment. Doc. No. 131 at 17–18. But

---

[4]     As explained *infra* at 12–13, the negation of the informational materials exemption is not an offense element that must be found by the jury. Thus, although the evidence previewed in the paragraph above is relevant to whether the unpublished draft datasheets constitute technology under the ITSR, any defense based on the informational materials exemption would properly be decided not by the jury, but by the Court, after hearing all the trial evidence and consistent with the jury's other findings.

that contention overlooks the next sentence of the Berman Amendment, which says the exemption does **not** include exports of items subject to certain Commerce Department export controls — like the unpublished draft datasheets here. 50 U.S.C. § 1702(b)(3). Moreover, besides being inconsistent with this plain language of the Berman Amendment, Sadeghi's contention, if accepted, would have staggering implications, rendering the U.S. government powerless under IEEPA to keep cutting-edge American industrial know-how out of the hands of hostile regimes around the world. Under his view, the government could prohibit giving Iran a fish, but not teaching Iran to fish. There is no basis to think that Congress intended those implications when it enacted a statutory amendment whose impetus was books and magazines.

Finally, Sadeghi contends that the indictment is deficient because it fails to allege that the datasheets are not informational materials and thus not exempt from IEEPA under the Berman Amendment. Doc. No. 131 at 13–14. But the fact that the datasheets are not informational materials is not an element of an IEEPA and ITSR offense. Whether a particular factor mentioned in a federal criminal statute is an offense element that must be alleged in the indictment (and ultimately found by the jury) is a question of congressional intent that courts answer using traditional rules of statutory interpretation. *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998). Courts look to the statute's language and structure, *id.*, and "ordinarily resist reading words or elements into a statute that do not appear on its face," *Bates v. United States*, 522 U.S. 23, 29 (1997).

Here, the provision of IEEPA that Sadeghi is charged with violating makes no mention of "informational materials." It says only that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a); *see also id.* § 1705(c) (adding mens rea element

of willfulness for criminal penalties). This straightforward reading of the statutory language is further confirmed by the statute's structure. The Berman Amendment's exemption for informational materials is located in a separate section of IEEPA concerning not the **elements** of IEEPA's criminal prohibition, but instead the **scope of authority** granted to the President. *Id.* § 1702(b) (titled "Presidential authorities"); *see also Almendarez-Torres*, 523 U.S. at 234 ("the title of a statute and the heading of a section" are relevant in determining whether a factor constitutes an offense element (citation omitted)).

Nor is the negation of the informational materials exemption an element of the ITSR provision that Sadeghi is charged with violating. *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) ("Regulations are interpreted according to the same rules as statutes …." (citation omitted)). That provision prohibits "the exportation … or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran" without a license. 31 C.F.R. § 560.204; *see also id.* § 560.206(a). It nowhere mentions the exemption for informational materials, which is located in a separate section of the ITSR. *Id.* § 560.210(c)(1). Because the negation of the informational materials exemption is not an element of the IEEPA and ITSR offense that Sadeghi is charged with, it need not be alleged in the indictment.

The indictment properly alleges all the necessary elements of the IEEPA and ITSR offenses. It is thus not subject to dismissal for failure to state an offense.[5]

---

[5]     A significant portion of Sadeghi's brief addresses an ITSR provision stating that the Berman Amendment does not exempt — and thus the ITSR prohibit — "transactions related to information or informational materials not fully created and in existence at the date of the transactions," 31 C.F.R. § 560.210(c)(2). He contends that the datasheets do not fall within that provision, Doc. No. 131 at 18–20, that the provision is inconsistent with IEEPA, *id.* at 20–21, and that the provision is a content-based speech restriction that violates the First Amendment, *id.* at 23–24. But Counts 2–4 do not charge a violation of that ITSR provision, and the government's

### B. IEEPA and the ITSR are not unconstitutionally vague

Sadeghi next contends that IEEPA and the ITSR are unconstitutionally vague under the Fifth Amendment as applied to his export of the unpublished draft datasheets to Iran. Doc. No. 131 at 14–16. But courts have "uniformly rejected" vagueness challenges to IEEPA, and there is no reason to reach a different conclusion here. *United States v. Vaghari*, No. 08-cr-693, 2009 WL 2245097, at *2 (E.D. Pa. July 27, 2009); *see, e.g.*, *United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 77 (2d Cir. 1986); *United States v. Amirnazmi*, 645 F.3d 564, 588–91 (3d Cir. 2011); *United States v. Ehsan*, 163 F.3d 855, 860 (4th Cir. 1998); *Shih*, 73 F.4th at 1094; *United States v. Soussi*, 316 F.3d 1095, 1101–03 (10th Cir. 2002); *United States v. Quinn*, 401 F. Supp. 2d 80, 100–01 (D.D.C. 2005); *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821, 830–31 (N.D. Ohio 2005).

A criminal statute is void for vagueness only if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). That principle "does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." *Rose v. Locke*, 423 U.S. 48, 49 (1975). Nor is a statute void for vagueness simply because "trained lawyers" must "consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty" what the statute forbids. *Id.* at 50. Under this standard, Sadeghi's vagueness challenge fails.

---

theory does not rely on it. Instead, the reason the datasheets underlying Counts 2–4 are not exempt under the Berman Amendment is that they were controlled for export by the Commerce Department. As a result, they fall squarely within the carveout in the second sentence of the Berman Amendment, 50 U.S.C. § 1702(b)(3), and the corresponding ITSR provision, 31 C.F.R. § 560.315(b). This case therefore does not implicate the application or validity of the "not fully created" provision of the ITSR.

The elements of the IEEPA and ITSR offenses charged in Counts 2–4 are clearly defined. IEEPA makes it "unlawful for a person to violate … any … regulation[] or prohibition issued under" the statute. 50 U.S.C. § 1705(a). The ITSR, which were issued under IEEPA, prohibit "the exportation, … directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran" without a license. 31 C.F.R. § 560.204; *see also id.* §§ 560.203, 560.205, 560.206.

The ITSR indicate that the term "technology" — the only aspect that Sadeghi claims is vague — is informed by the definition of that term in Commerce Department regulations. *See id.* § 560.418 note 1. The Commerce Department regulations define "technology" as "[i]nformation necessary for the development, production, use, operation, installation, maintenance, repair, overhaul, or refurbishing … of an item." 15 C.F.R. § 772.1 (internal quotation marks omitted). These regulations further clarify that, in general, "'technology' … is 'published,' and is thus not 'technology' … subject to the EAR, when it has been made available to the public without restrictions upon its further dissemination." *Id.* § 734.7(a). The ITSR thus do not sweep in exports to Iran of anything that could be deemed to have an informational component, however minor, but instead target closely held information used to make, operate, or maintain an item — like the draft datasheets underlying Counts 2–4, which were not public and which detailed the technical performance and characteristics of U.S. Company 1's electronic components.

This straightforward meaning is bolstered by the principle that "[c]ourts are less likely to conclude that statutes and regulations 'addressed to sophisticated businessmen'" are unconstitutionally vague because they are presumed to "'consult counsel in planning their activities,' and some 'administrative process' will often be available 'to secure advisory interpretations of the statute [or regulation]' at issue." *United States v. Facteau*, 89 F.4th 1, 33

n.20 (1st Cir. 2023) (citation omitted; second brackets in original). Here, Sadeghi worked as an engineer for a global semiconductor manufacturer, had a Ph.D. in electrical engineering, and created a business proposal to provide intellectual property and knowledge transfer to Iran. Indictment ¶¶ 1, 3, 4, Doc. No. 14 at 1–2.

Moreover, OFAC, which administers the ITSR, has a "Compliance Hotline" where the public can "contact OFAC for guidance on how to comply with OFAC-administered sanctions programs." OFAC Compliance Hotline, https://ofac.treasury.gov/ofac-compliance-hotline (last visited Oct. 23, 2025). In addition, as explained above, the meaning of "technology" in the ITSR is informed by the definition of that term in Commerce Department regulations (*see supra* at 5), and the Berman Amendment and ITSR allow regulation of exports of items subject to Commerce Department export controls (*see supra* at 7–8). The Commerce Department has a similar system allowing the public to ask whether a particular item is subject to Commerce Department export controls. U.S. Dep't of Commerce Bureau of Industry and Security, SNAP-R, https://snapr.bis.gov/ (last visited Oct. 23, 2023). And Sadeghi also could have consulted his employer's legal or compliance departments about whether it was permissible to export the company's confidential datasheets to an Iranian company that sold drone parts to the IRGC. If Sadeghi had any doubt about whether he could lawfully send the unpublished draft datasheets to Iran, he had "abundant opportunity to obtain clarification" through these processes. *Amirnazmi*, 645 F.3d at 591; *accord Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1147 n.13 (9th Cir. 2009).

IEEPA also has a high mens rea requirement, which eliminates any concerns about fair notice or risk of unintentional violation. The statute criminally punishes only "willful[]" violations. 50 U.S.C. § 1705(c). A "mind intent upon willful evasion is inconsistent with

surprised innocence." *United States v. Ragen*, 314 U.S. 513, 524 (1942). "To act 'willfully' means to act voluntarily and intelligently and with the specific intent that the underlying crime be committed — that is to say, with bad purpose, either to disobey or disregard the law — not to act by ignorance, accident or mistake." First Circuit Pattern Crim. Jury Instructions § 2.17. Innocent intent is not a mere affirmative defense; the government bears the burden of proving beyond a reasonable doubt that the defendant specifically intended to disobey or disregard the law. A defendant can hardly complain of a lack of fair warning when he intends to break the law. *See Colautti v. Franklin*, 439 U.S. 379, 395 n.13 (1979); *see also United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013) ("Where a statute 'explicit[ly] provi[des] that a criminal violation of its terms must be "willful,"' the void-for-vagueness doctrine is especially inapposite, since the statute itself ensures that 'good-faith errors are not penalized.'" (citations omitted)). This "presence of culpable intent as a necessary element of the offense" resolves any vagueness concerns. *Boyce Motor Lines v. United States*, 342 U.S. 337, 342 (1952).

Finally, Sadeghi attempts to invoke the rule of lenity. Doc. No. 131 at 16. But that rule "is a last resort" that applies only if, after "exhaust[ing] the tools of statutory construction," a court is "still left with" a "grievous ambiguity" about the statute's meaning. *Ehsan*, 163 F.3d at 857–58 (quoting *Chapman v. United States*, 500 U.S. 453, 463 (1991)). Because normal interpretative tools provide fair notice and ascertainable limits on what IEEPA and the ITSR cover, the rule of lenity does not apply. The motion to dismiss Counts 2–4 on vagueness grounds should be denied.

### C.      IEEPA and the ITSR are valid under the First Amendment

Sadeghi also contends that IEEPA and the ITSR's prohibition on exporting the unpublished draft datasheets to Iran without a license violates the First Amendment. Doc. No. 131 at 22–26. Even if exporting technology were sufficiently expressive to implicate the First Amendment, First Amendment precedent draws a fundamental distinction between two

categories of laws restricting speech. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025). Content-based laws — "those that target speech based on its communicative content" — are subject to strict scrutiny and are unconstitutional unless they are the "least restrictive means of achieving a compelling state interest." *Id.* (citations omitted). By contrast, content-neutral laws, because they "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue," are subject to intermediate scrutiny and are constitutional if they "advance[] important governmental interests unrelated to the suppression of free speech and do[] not burden substantially more speech than necessary to further those interests." *Id.* (citation omitted); *see also United States v. O'Brien*, 391 U.S. 367, 376 (1968) (a "sufficiently important government interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms").

The test for distinguishing between content-based and content-neutral laws is whether the law "on its face"[6] "applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69, 76 (2022) (citation omitted). A law is not content based under this test, however, if it "requires an examination of speech only in service of drawing" other "neutral" lines. *Id.*

"IEEPA is not aimed at expression," and "[n]othing on the face of IEEPA implicates First Amendment rights." *Humanitarian Law Project*, 578 F.3d at 1142–43. Neither IEEPA nor the ITSR prohibit Sadeghi from advocating or espousing views supporting Iran or the Iranian government. Instead, IEEPA and the ITSR prohibit the export of goods, technology, and services

---

[6]     While a law's "justification or purpose" can also render it content based, Sadeghi does not claim that IEEPA or the ITSR were "adopted … 'because of disagreement with the message'" conveyed by any speech that they regulate. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164, 165–68 (2015) (citation omitted).

to Iran without a license — without regard to content or viewpoint. Whether something constitutes technology — under both standard dictionary definitions and the Commerce Department regulations that inform the meaning of technology in the ITSR, 15 C.F.R. §§ 734.7(a), 772.1 — is "based on its *function*," not its expressive message, confirming that IEEPA and the ITSR are content neutral. *United States v. Chi Mak*, 683 F.3d 1126, 1134–35 (9th Cir. 2012) (holding that Arms Export Control Act and implementing regulations, which criminalized export of "technical data" without a license, were content neutral because technical data was defined based on function, not message).

Sadeghi asserts that the ITSR are content based because they require the factfinder to consider the content of the datasheets to determine whether they constitute technology whose export is prohibited. Doc. No. 131 at 23–24. But the Supreme Court has rejected the argument that a "regulation is automatically content based" merely because it "requires reading the [item] at issue," and instead has explained that a law is content neutral if it requires considering the item's content only in service of applying other neutral lines. *City of Austin*, 596 U.S. at 69; *see also Chi Mak*, 683 F.3d at 1134 (to determine whether a law is content based, courts focus on "the nature of the statute," not "the nature of the content incidentally restricted"). The datasheets' substantive message — if they could even be said to express a message — is irrelevant to the application of the ITSR. What matters is their function.[7]

---

[7]     Sadeghi also claims the ITSR are "speaker-based" speech restrictions. Doc. No. 131 at 23–24. But the ITSR's prohibitions apply to all persons in the United States and to all U.S. persons, wherever located. 31 C.F.R. §§ 560.203–206. In any event, the Supreme Court has explained that the level of First Amendment scrutiny does not turn on whether a law is speaker based. That fact is relevant only to the extent it indicates whether the law is **content** based, which is the key question for determining the level of scrutiny. *Reed*, 576 U.S. at 170 ("Characterizing a distinction as speaker based is only the beginning — not the end — of the inquiry.").

IEEPA and the ITSR satisfy intermediate scrutiny. Sadeghi acknowledges that the government has a "legitimate interest in responding to Iran's threat to national security." Doc. No. 131 at 26; *see Ehsan*, 163 F.3d at 859 (ITSR's "broad export ban" reflects "the nation's interest in sanctioning Iran's sponsorship of international terrorism, its frustration of the Middle East peace process, and its pursuit of weapons of mass destruction"); *accord United States v. Zarrab*, No. 15-cr-867, 2016 WL 6820737, at *8 (S.D.N.Y. Oct. 17, 2016). That interest is unrelated to the suppression of speech. And the ITSR do not burden substantially more speech than necessary to achieve that interest. Indeed, though intermediate scrutiny does not require a law to employ the least speech-restrictive means of accomplishing its purpose, *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989), Sadeghi does not identify **any** less restrictive alternative to the ITSR's prohibition on exports of technology to Iran that would still achieve the government's interest.[8] *See United States v. Posey*, 864 F.2d 1487, 1496–97 (9th Cir. 1989) ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment." (citation omitted)); *accord Stagg P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 96 (2d Cir. 2016).

Sadeghi instead contends that the ITSR do not advance the government's interest because the final versions of datasheets are often published on the internet. Doc. No. 131 at 26. But that contention misconstrues the scope of the ITSR. The Commerce Department regulations that inform the meaning of the term "technology" in the ITSR generally do not prohibit the export of technology after it becomes publicly available. 15 C.F.R. § 734.7(a). And here, the indictment

---

[8]     Sadeghi's failure to identify any less restrictive, equally effective alternative means the ITSR would also satisfy strict scrutiny if it applied. *See Burson v. Freeman*, 504 U.S. 191, 206–07 (1992) (plurality op.).

alleges — and the Court must take as true on this motion to dismiss, *see Boyce Motor Lines*, 342 U.S. at 343 n.16 — that the datasheets underlying Counts 2–4 were **not** public when Sadeghi transferred them. Indictment ¶¶ 23(n), 29, Doc. No. 14 at 11–12, 15. Properly construed and applied here, the ITSR do not burden substantially more speech than necessary to achieve the government's interest, rendering them valid under the First Amendment. The motion to dismiss Counts 2–4 on First Amendment grounds should thus be denied.

### D.    IEEPA is not an unconstitutional delegation of power

Finally, Sadeghi contends that IEEPA constitutes an unconstitutional delegation of legislative power to the executive branch. Doc. No. 131 at 26–27. But as "every Circuit to have considered the issue" has concluded, "IEEPA is constitutional" under this doctrine. *Shih*, 73 F.4th at 1092; *see United States v. Dhafir*, 461 F.3d 211, 216 (2d Cir. 2006); *Amirnazmi*, 645 F.3d at 574–81; *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093 (4th Cir. 1993); *United States v. Mirza*, 454 F. App'x 249, 254–56 (5th Cir. 2011).

While Congress cannot delegate legislative power to the other branches, it can "seek[] assistance" from another branch and can "vest[] discretion" in the executive branch to implement and apply the laws Congress has enacted — including "by deciding on 'the details of [their] execution.'" *FCC v. Consumers' Research*, 145 S. Ct. 2482, 2496–97 (2025) (citation omitted). If a statute sets forth an "intelligible principle" to guide the executive branch's actions, it constitutes a lawful grant of discretion instead of an unlawful delegation of legislative power. *Id.* at 2497 (citation omitted). A statute satisfies that requirement if it defines both "the general policy" to be pursued and "the boundaries of [the] delegated authority." *Id.* (citation omitted). That test is "not demanding." *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality opinion). Under that test, the Supreme Court has upheld statutes authorizing executive agencies to regulate in the "public interest," *see Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26

(1943), to set "just and reasonable" rates for natural gas, *see Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944), to set "fair and equitable" commodity prices, *see Yakus v. United States*, 321 U.S. 414, 420–27 (1944), to identify and recover "excessive profits," *see Lichter v. United States*, 334 U.S. 742, 774–87 (1948), and to set air-quality standards "requisite to protect the public health," *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472–76 (2001).

IEEPA defines both the general policy that the executive branch must pursue and the boundaries of the delegated authority. The statute directs the President to exercise his authorities "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). That directive appropriately preserves the President's considerable discretion in an area concerning foreign affairs, which permits "a standard far more general than that which has always been considered requisite with regard to domestic affairs." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (citation omitted); *see also Dhafir*, 461 F.3d at 217. Nevertheless, that directive also provides meaningful guidance about the policy that the executive branch must pursue — and significantly more than in other statutes that the Supreme Court has upheld.

IEEPA also delineates the boundaries of the President's and the Treasury Department's authority. It specifies that the President cannot exercise any authorities under the statute unless he first finds that "an 'unusual and extraordinary threat … to the national security, foreign policy, or economy of the United States' originating on foreign soil has reached 'national emergency' proportions." *Amirnazmi*, 645 F.3d at 576 (quoting 50 U.S.C. § 1701). The statute preserves "Congress's role as ultimate arbiter of emergency trade policy" by establishing mechanisms for Congress to review and terminate national emergencies declared by the President and by

providing a sunset period for such emergencies if not renewed. *Id.* (citing 50 U.S.C. §§ 1622, 1706(b)); *see also Dhafir*, 461 F.3d at 217. The statute forbids the President from exercising his authorities for any purpose other than dealing with a declared national emergency. 50 U.S.C. § 1701(b); *Dhafir*, 461 F.3d at 216–17. The statute also requires the President to "consult with Congress before, if possible, exercising the powers conferred, to explain his acts in specified respects, and to report regularly thereafter during the period of the emergency." *Arch Trading Co.*, 987 F.2d at 1093 (emphasis deleted) (citing 50 U.S.C. § 1703); *see also* 50 U.S.C. § 1706(d). The statute prohibits the President from regulating certain exempt transactions, including those within the scope of the Berman Amendment. 50 U.S.C. § 1702(b). And the statute prohibits the President from "prosecuting unwitting violators" and "those who act in good faith reliance on the statute and regulations." *Amirnazmi*, 645 F.3d at 576 (quoting 50 U.S.C. §§ 1705(c) & 1702(a)(3)). These careful statutory bounds show that "IEEPA meaningfully constrains the Executive's discretion." *Id.* at 577.

The motion to dismiss Counts 2–4 under the nondelegation doctrine should thus be denied.

//

//

//

//

//

//

//

//

## V.     Conclusion

For these reasons, the motion to dismiss should be denied.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ Garrett Coyle
JARED C. DOLAN
ALATHEA E. PORTER
Assistant United States Attorneys

CHRISTINA A. CLARK
LESLIE C. ESBROOK
GARRETT COYLE
Trial Attorneys
National Security Division
U.S. Department of Justice

Dated: November 4, 2025

**Certificate of Service**

I certify that I filed this document via the CM/ECF system on November 4, 2025, which caused the document to be electronically served on all counsel of record.

/s/ Garrett Coyle
Garrett Coyle

Dated: November 4, 2025