UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MAHDI MOHAMMAD SADEGHI, a/k/a<br>MOHAMMAD MAHDI SADEGHI,<br><br>Defendant. | No. 1:24-CR-10391-IT |

**GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT
EVIDENCE RELATED TO SDRA'S PRODUCTION OF
TECHNOLOGY USED IN IRANIAN UNMANNED AERIAL VEHICLES**

## I.      Introduction

Defendant Mahdi Sadeghi is charged in the Superseding Indictment with an expansive scheme to illegally export electronic components to Iran, specifically, to Mohammad Abedini and his company, San'at Danesh Rahpooyan Aflak Co. ("SDRA" or "SADRA").  SDRA is at the center of the charged conspiracy and each of the substantive counts against Sadeghi.  SDRA's primary product is the Sepehr, a navigation system used in the Shahed family of unmanned aerial vehicles ("UAVs") used by Iran and its proxies to conduct terrorist attacks throughout the Middle East.

Sadeghi is familiar with the business of SDRA and regularly visited the SDRA offices when he was in Tehran, Iran.  Sadeghi had a copy of both the Sepehr user manual and a device schematic on his personal laptop.  In 2024, two Shahed UAVs were recovered by investigators and analyzed by the Federal Bureau of Investigation ("FBI").  The UAVs both contained computer code that referenced SADRA and shared features of code found in the Sepehr user manual and the computer code in Abedini's email account.

The location of SDRA and the nature of its business are both facts that are directly relevant to the charges against Sadeghi to prove that he willfully exported parts to Iran.  The probative

value of the evidence the government intends to submit on this matter is also strong.  Because the government has already taken significant steps to mitigate prejudice related to this evidence, the probative value is not substantially outweighed by the danger of unfair prejudice or any of the other concerns under Rule 403.  The evidence should be admitted.

## II.    Factual Background

The government's specific evidence is categorized as follows:

### a.    Chain of Custody Evidence for Two UAVs

On the morning of January 28, 2024, a UAV struck a housing unit at a military outpost in Northern Jordan near the Syrian border called Tower 22, killing three U.S. Servicemembers and seriously injuring over forty others.  Hours later, on the same day, a second UAV was shot down by U.S. forces near a military base in Syria.  Portions of both UAVs, including the microcontrollers, were photographed, recovered and analyzed by the FBI.  Absent a stipulation, the government will introduce evidence from members of the military, for chain of custody purposes only, to establish that the two UAVs were recovered in Jordan and Syria and that their parts, including the two recovered microcontrollers, were transported to a laboratory in the United States.  The government does not plan to elicit testimony regarding the impact of the UAVs, the specific locations in which they were recovered (at or near U.S. military bases), analysis of the harms caused by the UAVs, or any description of the UAV attack in Jordan.

### b.    Laboratory Analysis of Parts Collected

In 2024, the FBI's Terrorist Explosive Device Analytical Center ("TEDAC"), Technical Exploitation Unit, conducted analysis of the recovered UAV parts from Jordan and Syria. Specifically, FBI Analyst Ethan Howell will testify as to analysis conducted on the

microcontrollers.[1]    Initial analysis of the microcontrollers was unsuccessful because the microcontrollers were locked and the data within the microcontrollers was inaccessible.  Howell will explain that a technical exploit was used to unlock the microcontrollers and read the internal code.  He will further explain that the data extraction was reflected in hexadecimal code.  The government does not plan to elicit testimony regarding the analysis of any other parts of the recovered UAVs.

### c.  Visual Analysis of Parts Collected

Damien Spleeters is an expert weapons investigator.  He has personally conducted physical examinations of thirty Iranian Shahed UAVs and supervised the physical examination of over forty others.  These examinations were of UAVs recovered in Ukraine, Syria, and Israel.  With respect to this case, Spleeters has exhaustively examined the pictures that were taken of the UAVs recovered in Jordan and Syria and prepared a report of his findings.  Spleeters will testify that based on his training and experience, both the UAV recovered in Jordan and the UAV recovered in Syria are consistent with the Shahed-family of UAVs manufactured by Iran.  He will also testify that he was previously familiar with the name "SADRA" because he observed labels bearing that name on navigation-related modules of other Iranian-origin UAVs.

### d.  Technical Analysis of Data Extracted

FBI Computer Scientist Quillen Flanigan will testify as to his comparison between the hexadecimal extraction from the microcontrollers from the UAVs recovered in Jordan and Syria and the evidence in this case.  CS Flanigan converted the hexadecimal strings to ASCII format and

---

[1] The government can prepare Howell to describe his assignment as the "Technical Exploitation Unit," without reference to the Terrorist Explosive Device Analytical Center.

located significant extracted strings within the UAV code. This included the manufacturer, "SADRA CO LTD," the firmware, "SEPEHR, v.1.43.023," and the device, "SPHR."

CS Flanigan compared the code from the microcontrollers to the data transmission protocol found in the Sepehr User Manual located on Sadeghi's personal laptop. CS Flanigan determined that several functions in the microcontroller code matched the data transmission protocol in the manual. CS Flanigan also compared the UAV code to code located in a zip file titled "firmware v.0.031 release" found in Abedini's email account. CS Flanigan was able to match portion of the UAV code to the firmware as well.

### III.    Legal Standard

"Evidence is relevant" where it pertains to a fact that "is of consequence in determining the action." Fed. R. Evid. 401. Evidence is relevant is it "move[s] the inquiry forward to some degree." *United States v. Criz-Ramoz*, 987 F.3d 27, 42 (1st Cir. 2021). "Relevancy, however, is a condition precedent to admissibility, not an ironclad guarantee of admissibility." *Torres-Arroyo v. Rullan*, 426 F.3d 1, 7 (1st Cir. 2006). Courts may exclude even relevant evidence where its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403. "When conducting the Rule 403 balancing test, courts must heed that the default rule is that relevant evidence will be admitted." *United States v. Soler-Montalvo*, 44 F.4t 1, 16 (1st Cir. 2022). "The standard for exclusion under Rule 403 is a high one." *United States v. Pires*, 138 F.4th 649, 670 (1st Cir. 2025) (quoting *Soler-Montalvo*, 44 F.4th at 16). Rule 403 makes clear that defendants are protected only "against unfair prejudice, not against all prejudice." *United States v. Rivera Gomez*, 67 F.3d 993, 997 (1st Cir. 1995). "By design, all evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided." *United States v. Gobbi*, 471 F.3d 302, 312 (1st Cir. 2006) (quoting *United States v. Rodriguez-*

*Estrada*, 877 F.2d 153, 156 (1st Cir. 1989) (emphasis in original)).  Unfair prejudice is that which carries a genuine risk "that the emotions of the jury will be excited to irrational behavior, and that the risk is disproportionate to the probative value of the evidence."  *United States v. Fahey*, 769 F.2d 829, 849 (1st Cir. 1985) (internal citations omitted); *see also United States v. Rivera*, 83 F.3d 542 (1st Cir. 1996) (noting that "[t]he admitted evidence must not only be prejudicial, but be unfairly prejudicial, and not only outweigh relevance but substantially outweigh relevance," and that "where the reviewing court finds the balancing close, Rule 403 tilts the balance in favor of admission").  "Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  *United States v. DiRosa*, 761 F.3d 144, 153 (1st Cir. 2014) (marks omitted).

## IV.    Argument

### a.  Evidence Related to the End Use of SDRA's Products is Plainly Relevant

Evidence as to the UAVs recovered in Jordan and Syria is plainly relevant.  The criminal conspiracy charged in the Superseding Indictment concerns a sanctions evasion scheme to export U.S.-origin parts to SDRA using a Swiss front company (Illumove SA).  Proof that SDRA's main product is used in Iranian-made Shahed UAVs tends to show that SDRA is an Iranian company. In a case involving the evasion of Iranian sanctions, proof that the recipient of the goods at issue is based in Iran is direct proof of an element of the offense, that is, that the goods were exported to Iran.

The UAV evidence is also relevant to show Sadeghi's knowledge and intent.  A defendant's knowledge of the likely end-user of illegally exported goods is relevant to assess his state of mind. *See United States v. McKeeve*, 131 F.3d 1, 13 (1st Cir. 1997).  The government's evidence will establish that Sadeghi and Abedini/SDRA had a business relationship dating back to 2016.

Sadeghi regularly visited the SDRA offices when he traveled to Iran and entered into a contract with SDRA in 2017 for its fusion algorithm. Sadeghi's cellular phone logged in to the SDRA Wi-Fi and the Wi-Fi password for SDRA was saved on his cellular phone. Sadeghi's close and repeated contact with SDRA and its offices shows that Sadeghi likely knew the scope of its business, including who SDRA sold its navigation systems to. Evidence of shipment to an end user with ties to the Iranian military strongly suggests that Sadeghi willfully evaded sanctions.

In addition, evidence of SDRA's connection to Iranian UAVs is relevant because it provides helpful context for the significance of documents found in Sadeghi's possession related to SDRA. Investigators located the user manual for the Sepehr Navigation System and a schematic for the actual device on Sadeghi's personal laptop. The probative power of Sadeghi's time spent at SDRA and the import of these technical documents found on Sadeghi's personal laptop will be substantially reduced without additional testimony and evidence describing what the navigation system was used for. These technical documents would have been easy for Sadeghi to understand. In addition to his practical training and experience in micro-electromechanical systems ("MEMS"), Sadeghi has a Ph.D. from the University of Michigan and a Masters Degree from the University of Tehran, both in Electrical Engineering. The average juror, however, will not have Sadeghi's level of expertise, and without testimony and evidence about the nature of SDRA's business and connecting the SDRA schematics and manual possessed by Sadeghi to the actual navigation system recovered from the UAVs, much of the probative power of that evidence will be diminished.

From a larger perspective, the nature of SDRA'S business explains its interest in ADI's products and the benefit it was receiving from its relationship with ADI, through Sadeghi, during the conspiracy. Abedini's email account contained a business plan for SDRA from 2014. This

business plan sets forth the goals of SDRA, *inter alia*, to manufacture navigation systems for the Iranian military and increase domestic capacity to produce products while evading international sanctions. That this goal succeeded, shown by the evidence that SDRA's navigation system was found in two Iranian UAVs ten years later, both corroborates the business plan and establishes the motive behind the formation of the conspiracy and relationship with Analog Devices.

### b. <u>The Government Has Proactively Taken Steps to Prevent Unfair Prejudice</u>

The government recognizes that the circumstances surrounding the attack on Tower 22 present the possibility of unfair prejudice and has taken affirmative steps to mitigate any danger of unfair prejudice. First, the government will not present any evidence that the UAV recovered in Jordan was used in an attack on a U.S. military base or that it caused the deaths and injuries of servicemembers, nor will the government present evidence that the second UAV was shot down by the U.S. military. Second, the government has offered to stipulate to chain of custody, which would essentially exclude evidence as to who found the UAVs and obviate the need to present testimony as to chain of custody by a string of uniformed servicemembers. Third, the government will not present evidence that the UAVs were recovered from or near U.S. military bases. Fourth, the government will not present evidence regarding recovery or analysis for any of the other parts of the UAVs recovered except for the purposes of Spleeters' testimony.

Through that lens, the limited evidence the government intends to present related to the recovered UAVs does not present any of the typical dangers that the unfair prejudice provision of Rule 403 is designed to prevent. It is divorced from Rule 404(b) and presents no issues of criminal propensity. *Cf. United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000). It is not "emotionally laden" and would not "permate[] the record." *United States v. Kilmartin*, 944 F.3d 315, 337 (1st Cir. 2019). And while the evidence would tend to show that Sadeghi entered into a

sanctions evasion conspiracy with a person and entity in the business of creating products used in kinetic UAVs, such a showing is not unfair where it is so closely linked to the charged crime. Certainly it does not suggest that the jury find him guilty based on a ground different from the charged crime. *DiRosa*, 761 F.3d at 153. "[T]he court is not required to scrub the trial clean of all evidence that may have an emotional impact, where the evidence is 'part of the Government's narrative.'" *United States v. Morales-Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008); *see also McKeeve*, 131 F.3d at 13 (affirming admission of evidence that defendant was told that "virtually all computers sent to Libya ended up in arms factories" to show his knowledge that export was unlawful under both 401 and 403). In light of the highly probative nature of the evidence, and given how the government has narrowed the evidence to avoid *unfair* prejudice, on balance, the prejudice does not substantially outweigh the probative value. *See United States v. Smith*, 292 F.3d 90, 99 (1st Cir. 2002) (noting that Rule 403 "shields a defendant 'against *unfair* prejudice, not against *all* prejudice'") (emphasis in original).

## V.   Conclusion

The Court should grant the motion *in limine* and allow the government to present the evidence described herein.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   */s/ Jared C. Dolan*

JARED C. DOLAN
ALATHEA E. PORTER
Assistant United States Attorneys

LESLIE C. ESBROOK
Trial Attorney

8

## CERTIFICATE OF SERVICE AND RULE 7.1

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.  I certify that the government has conferred with counsel for the defendant, Mahdi Sadeghi, who opposes the relief sought.

/s/ Jared C. Dolan
Jared C. Dolan
Assistant United States Attorney

Date: February 6, 2026