UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MAHDI MOHAMMAD SADEGHI, a/k/a<br>MOHAMMAD MAHDI SADEGHI,<br><br>Defendant. | No. 1:24-CR-10391-IT |

**GOVERNMENT'S MOTION IN LIMINE TO ADMIT
CO-CONSPIRATOR STATEMENTS**

The United States of America hereby moves this Court to allow statements made by Sadeghi's co-conspirators Mohammad Abedini (hereinafter, "Abedini") and the individual designated in the Superseding Indictment as Swiss Employee 1 into evidence at trial. The government plans to offer evidence of those statements primarily through electronic search warrant returns. The statements were made by Abedini and Swiss Employee 1 in furtherance of the conspiracy charged in the Superseding Indictment. The Court should admit the proffered statements of Abedini and Swiss Employee 1 as evidence at trial as co-conspirator statements.

**FACTUAL BACKGROUND**

The Superseding Indictment alleges that Sadeghi and Abedini conspired to violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations ("ITSR") by engaging in a long-running scheme to export sophisticated electronic components to Abedini and his company, Sa'nat Danesh Rahpuyan Aflak Company Ltd ("SDRA"). Most of those electronic components were sent to Illumove SA, a front company located in Switzerland that was using an address at the Swiss Federal Technology Institute of Lausanne ("EPFL"). At trial, the government anticipates offering evidence, including email

records, testimony, and other business records, to prove that Sadeghi joined this conspiracy involving Abedini and others.[1]

Without limitation, the general categories of communications the government anticipates offering as evidence in its case-in-chief include: (1) communications between Abedini and defendant; (2) records created, kept, and sent by Abedini pursuant to his role at SDRA; (3) records created, kept, and sent by Abedini and/or Swiss Person 1 regarding the establishment of Illumove in Switzerland; and (4) records created, kept, and sent from an email address, sdra.co.ir@gmail.com.[2]

## **LEGAL STANDARD**

Federal Rule of Evidence 801(d)(2)(E) provides that statements "offered against an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay. The First Circuit's "decision in *Petrozziello* explains that such a statement is admissible when the trial judge finds 'it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy.'" *United States v. Ruiz*, 999 F.3d 742, 748 (1st Cir. 2021) (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)).

---

[1] There is no requirement that co-conspirators be named in the same indictment, or even charged. *See United States v. DiRosa*, 761 F.3d 144, 155 (1st Cir. 2014) ("Nor is it particularly important that [the Defendant] was not so indicted [with conspiracy], as the applicability of the co-conspirator exception is not conditioned on a conspiracy being charged in the indictment."); *see* Local Rule 116.1(c)(1)(E) (requiring the Government to notify the defendant of "the name of any person asserted to be a known unindicted conspirator").

[2] The government understands that Sadeghi will be filing a motion regarding co-conspirator statements and will address many of the statements at issue in this category. The government will accordingly address the admissibility of those statements in response to that motion.

"A district court faced with a challenge to the admission of a co-conspirator's statement must provisionally admit the statement and then wait until the end of the trial to consider whether, in light of all the evidence, the following four conditions are satisfied by a preponderance of the evidence: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; (3) the declarant was also a member of the conspiracy; and (4) the declarant's statement was made in furtherance of the conspiracy." *United States v. Diaz*, 670 F.3d 332, 348 (1st Cir. 2012).[3]

In determining the admissibility of co-conspirator statements, the Court may consider any relevant information, including the statements being offered for admission. *See Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *see also United States v. Rivera-Santiago*, 872 F.2d 1073, 1092-93 (1st Cir. 1989). "[T]he proponent of a statement must introduce some 'extrinsic evidence' of a conspiracy between the defendant and the declarant. In this context, extrinsic evidence means 'other evidence sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it.'" *Ruiz*, 999 F.3d at 748 (quoting *United States v. Piper*, 298 F.3d 47, 52 (1st Cir. 2002)).

Once a given defendant joins a conspiracy, the statements of their co-conspirators are admissible against them regardless of when their involvement began. *See United States v. Masse*, 816 F.2d 805, 811 (1st Cir. 1987) ("statement made by a co-conspirator . . . in furtherance of the

---

[3] Neither proffers of co-conspirator statements, nor pretrial rulings about the admissibility of such statements, are required by law. *United States v. Baltas*, 236 F.3d 27, 35 (1st Cir. 2001) (internal quotations omitted); *United States v. Isabel*, 945 F.2d 1193, 1198-99 (1st Cir. 1991) ("Appellants contend that the district court erroneously refused to conduct a pre-trial hearing on the admissibility of certain alleged coconspirator statements. Their contention is simply incorrect."). "[A]s a general rule, such a [pretrial] hearing, unlike a pretrial suppression hearing, would unnecessarily lengthen the proceedings. Evidentiary questions are grist for the mill of district court judges and, except in rare instances, can be handled competently in the trial context." *United States v. Medina*, 761 F.2d 12, 17 (1st Cir. 1985).

conspiracy . . . [is] admissible against the defendant even if made prior to the defendant's involvement in the conspiracy"). As the First Circuit explained in *United States v. Baines*, "a conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight -- or conduct -- regardless of whether he is aware of just what it is composed." 812 F.2d 41, 42 (1st Cir. 1987).

Nor is it necessary for the government to prove that each co-conspirator knew of or had contact with all other members, or that they knew all of the details of the conspiracy or participated in every act in furtherance of it. *United States v. Martinez-Medina*, 279 F.3d 105, 113-14 (1st Cir. 2002); *see also United States v. Marino*, 277 F.3d 11, 25 (1st Cir. 2002).

Additionally, statements of individuals who are not co-conspirators made during conversations with co-conspirators are also admissible in order to give context to the properly admissible statements of the conspirator. *United States v. Pena*, 24 F.4th 46, 61 (1st Cir. 2022) ("'Out-of-court statements offered not to prove the truth of the matter asserted but merely to show context—such as a statement offered for the limited purpose of showing what effect the statement had on the listener—are,' by definition, 'not hearsay' and thus not excludable under Rule 802.") (citations omitted); *United States v. Cruz-Díaz*, 550 F.3d 169, 176 (1st Cir. 2008).

## ARGUMENT

### I.    A Conspiracy to Violate the International Emergency Economic Powers Act Existed Between Sadeghi, Abedini, Swiss Employee 1, and Others.

The proponent of a statement must introduce some extrinsic evidence of a conspiracy between the defendant and the declarant. In this context, extrinsic evidence means "other evidence sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it." *Ruiz*, 999 F.3d at 748 (quoting *Piper*, 298 F.3d at 52). Because the Court must consider the co-conspirators' statements but cannot rely solely on the statements themselves to establish "the

existence of the conspiracy or participation in it," Fed. R. Evid 801(d)(2), the government intends to introduce sufficient extrinsic evidence to meet the criteria for admissibility.  In this case, there will be abundant evidence to support the requisite showing that a conspiracy existed to willfully send U.S.-origin parts to Iran via Switzerland without a required license from the U.S. government.

The SDRA conspiracy began as early as 2011, although the government will show the beginning of the relationship between Sadeghi and Abedini starting in 2016 and evidence as to that relationship will be introduced at trial using email correspondence and business records.  The evidence will show that Sadeghi was hired by ADI in March 2019 as an engineer in the Micro Electro Mechanical Systems (MEMS) group.  Likely in preparation for his upcoming collaboration with Sadeghi, Abedini traveled from Iran to Switzerland on August 6, 2019.  Sadeghi paid for Abedini's flight and forwarded the itinerary to Abedini.  According to records from GoDaddy, Abedini created the illumove.com domain on August 17, 2019.  On August 27, 2019, ten days after Abedini registered the Illumove domain, Sadeghi (from his ADI account) emailed Abedini (at his new Illumove account) with the subject line "test."  Later that same day, Sadeghi emailed his colleague at ADI, Tzeno Galchev, and provided information on Abedini:

> Hi Tzeno, Here is the contact person of the company I was talking about:  Mohammad Abedini m.abedini[at]illumove.com.  They have recently started a company in Lausanne, Switzerland.  Mohammad is their CTO and has a 50% appointment with EPFL.  I have worked with him and the team closely at Tacit Motion and based on my experience they are very competent in HW, FW, and SW development.  Probably for the analog parts design, they need the same handholding as the other guys needed but the nice thing is that it will be a one stop shop.

This internal ADI email was found in Abedini's Yahoo account in a folder titled "SDRA." Galchev subsequently emailed Abedini, cc'ing Sadeghi, about collaborating and requested that Abedini execute a Non-Disclosure Agreement with ADI.  Abedini indicated that he would be "honored" to work with ADI.

Thereafter, Abedini and Illumove negotiated and secured a contract from ADI for a project to design an Inertial Sensor Evaluation System (the "Evaluation Board project"). The proposal was submitted under the Illumove name and signed by Abedini and Swiss Employee 1. A slide deck that Galchev sent to Abedini describing the project proposal indicates that, from ADI's perspective, the evaluation board is important because it is the first experience new ADI customers have with ADI inertial sensors. Sadeghi was a backup engineer on the project. The project required ADI to provide Abedini with a wide range of ADI's sensors and included sensors that had not yet been released to the public. During the course of the conspiracy, ADI employees corresponded directly with Abedini and his team on the project, sending them a wide range of sensors, including accelerometers, gyroscopes, and inertial measurement units. These items were sent to an address at EPFL. Sadeghi knew and had reason to believe that the items sent to Abedini in Switzerland were ultimately going to Iran.

The circumstances surrounding Count Two are a good example. As of September 2022, Phase One of the Evaluation Board project was well underway between Illumove/Abedini and ADI. For ADI's part, the project had recently transitioned to a new engineer, Pablo Del Corro, when the prior engineer, Ian Beevers, left the company. While Sadeghi did not have direct responsibility for the project at ADI, he was still copied on many emails at ADI because of his relationship with Abedini. Sadeghi and Abedini also remained in contact by Telegram, WhatsApp, and other platforms (the chats were recovered by searching Sadeghi's devices). In early September 2022, chat records reflect that Sadeghi and Abedini had a lunch meeting in Iran. After that meeting Sadeghi went to the SDRA office with Abedini, although the purpose of the meeting is unstated.

On September 26, 2022, Sadeghi messaged Abedini, "Look, Ian [Beevers, the prior ADI engineer for the Evaluation Board project] had messed up the project a little. We need your help.

6

We want you to also add our new product to your first release of evalborad [sic]. 380/2. We can also send you samples. Let me know soon." Abedini responded, "Let me see what I can do. It might be possible." Sadeghi was the lead marketing engineer for the ADXL 380/2, a compact ultra-low noise, low-power, high-bandwidth accelerometer.

On September 27, 2022, Abedini messaged Sadeghi with the products that were going to be delivered during Phase One of the project and offered to replace one of the products with the 380/2. Abedini then told Sadeghi, "I am boarding the airplane right now to go to Switzerland. I will be there for one week. It would be great if you could send the samples tomorrow so I get them while I am there. If I'm not there to take delivery of it myself, getting it to Iran will become an issue again." Sadeghi responded, "I just spoke to Pablo. We agreed that you will do the 380/2 instead of 317. He will also send you the sample. He is supposed to send it today." FedEx records reflect that on September 29, 2022, a package was shipped from Analog Devices in Wilmington, MA to Mohammad Abedini/Illumove in Switzerland. The commercial invoice/packing list reflects that the shipment included 10 ADXL382 parts. According to travel records, Abedini traveled from Tehran to Milan on September 27, 2022 and returned to Tehran (from Geneva) on October 4, 2022.

## II.    Statements made by Abedini, Swiss Employee 1, and others were in furtherance of the conspiracy

### A. Statements of Abedini

The government expects that many of the statements made by Abedini will be not be objectionable. For example, statements made by Abedini to Sadeghi, whether by email or text, easily fall within the co-conspirator exception and in furtherance of the conspiracy that the government must ultimately prove beyond a reasonable doubt at trial. Those statements are also relevant for notice purposes to Sadeghi and to explain Sadeghi's knowledge and intent. Similarly,

7

many of Abedini's statements to ADI employees are technical in nature and tend to show the course and scope of the conspiracy as it evolved over time.

Abedini also kept his own records pursuant to his roles at SDRA and Illumove.  The government will seek to introduce those records as co-conspirator statements too, as they were necessary for the management of his affairs pursuant to the conspiracy.  The government provides two examples herein.  These are intended to be representative examples and not an exhaustive catalogue of the communications and documents that are admissible as co-conspirator statements in furtherance of the conspiracy, and which should be admitted at trial.

    1.   <u>The 2014 SDRA Business Plan</u>

Based on search warrant returns from Abedini's email account, on April 25, 2014, Abedini emailed a business plan for SDRA to one of the other founders.  The plan listed Abedini as the CEO.  The plan stated that "Main idea and final product" for SDRA was "Design, implementation, and production of flight computer for navigation, aerospace guidance and control systems for unmanned aircrafts, long-range missiles, vehicles, and surface and subsurface marine products."  The plan noted that its product prototype "was built to be used in unmanned airplanes and drones, and has military applications. But if requested by the customers, with some improvements the product can be used in bombs, guided missiles, vehicles, marine vessels, and other military industries of the country."  The plan stated that it would use contact with universities such as EPFL to gain the technical knowledge necessary to implement the business.  The plan noted that the main risk to the business plan of the company was sanctions and the ability to procure foreign parts.

While this document was dated in 2014 before Sadeghi joined the conspiracy, it is still admissible against him upon joining in Abedini's unlawful objectives (even if he does not know every aspect of the conspiracy).  *See Masse*, 816 F.2d at 811; *Baines*, 812 F.2d at 42. The Business

8

Plan sets forth statements of Abedini in furtherance of the conspiracy—it discusses SDRA's long-term objectives, identifies EPFL as a way to achieve those objectives, and notes that international sanctions are a risk factor for the business. The business plan also identifies that SDRA's eventual goal was to domestically produce items within fifteen years. The Business Plan sets forth the goals of the conspiracy and the object of the entire IEEPA conspiracy from its inception. It is admissible as a co-conspirator statement.

2. Illumove Ledger

Based on a search warrant as to a Microsoft One Drive account associated with Abedini, investigators found a full accounting and categorization of expenses associated with Illumove from 2020-2024. The document lists salaries for four individuals (including Abedini) and other expenses associated with the business. These expenses include specific purchases of goods and services, and how those goods and services were categorized, including for the Sepehr Navigation System. The accounting ledger, and the hearsay statements within, were designed to facilitate the day-to-day operations of the conspiracy and promote the continued success of the front company, Illumove.

**B. Statements of Swiss Employee 1**

Based on a search warrant as to a Microsoft One Drive account associated with Swiss Employee 1, investigators found a draft contract between Swiss Employee 1 and Abedini. That contract states that Illumove was formed as the sales and branding arm of SDRA. The contract expressly stated that Abedini was designated as a shareholder of Illumove because of sanctions on Iran and because an Iranian-origin company cannot be a corporate shareholder in Switzerland. It also states that "[i]t is obvious that Sadra's share of all illumove company's earnings must be transferred to Sadra through this representative [likely Abedini], appropriately and without

9

jeopardizing the integrity and credibility of illumove." The contract further states that Swiss Employee 1 did not accept the responsibility of any illegal activity in the framework of international laws, especially Iran and Switzerland, or in the direction of circumventing sanctions. It is black letter law that the government does not need to present a formal agreement to establish a conspiracy. *See United States v. Vaazquez-Botet*, 532 F.3d 37, 61 (1st Cir. 2008). However, when there are statements that evidence such an agreement, those statements qualify as co-conspirator admissions within the meaning of the rule.

Similarly, on March 23, 2020, Swiss Employee 1 emailed an EPFL employee, copying Abedini. Swiss Employee 1 said that they had received mail regarding taxes. Swiss Employee 1 then said, "As you know we only have a mail box there and we do not produce any trash." Swiss Employee 1 asked if there was anything that could be done about the tax. The EPFL employee responded noting that Illumove did not have any office space.

Maintenance of Illumove, a front company for SDRA and the recipient of the electronic components sent by ADI and Sadeghi, is within the course and scope of the conspiracy. "[A] coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy." *Piper*, 298 F.3d at 54. "[A] statement need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way." *Martinez-Medina*, 279 F.3d at 117 (1st Cir. 2002). Management of the Swiss front company and avoiding expenses did exactly that. The statement of Swiss Employee 1 facilitated the conspiracy by ensuring that the front company would continue to operate as a going concern despite at that point having no office space and producing no rubbish. Further, the response of the EPFL employee is admissible to give context to the properly admissible statements of the conspirator. *Pena*, 24 F.4th at 61.

10

**CONCLUSION**

For all the foregoing reasons, the statements of co-conspirators Mohammad Abedini and

Swiss Employee 1 are admissible at trial as co-conspirators' statements under Federal Rule of

Evidence 801(d)(2)(E).

Respectfully submitted,

LEAH B. FOLEY
United States Attorney


By:    /s/ Jared C. Dolan
       JARED C. DOLAN
       ALATHEA E. PORTER
       Assistant United States Attorneys

       LESLIE C. ESBROOK
       Trial Attorney


**CERTIFICATE OF SERVICE AND COMPLIANCE WITH LOCAL RULE 7.1**

I certify that I filed this document via the CM/ECF system on February 6, 2026, which caused the document to be electronically served on all counsel of record. I hereby certify that the government has conferred with counsel for the defendant, Mahdi Mohammad Sadeghi, who reserves the right to file a response to the government's Motion.

/s/ Jared C. Dolan
Jared C. Dolan
Assistant United States Attorney


Date: February 6, 2026