IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

MAHDI SADEGHI

No.  1:24-cr-10391-IT

**DEFENDANT MAHDI SADEGHI'S MOTION IN LIMINE
TO EXCLUDE EVIDENCE AND ARGUMENT ABOUT IRANIAN DRONES**

Pursuant to Fed. R. Evid. 401 and 403, Defendant Mahdi Sadeghi respectfully requests that this Court exclude all evidence and argument regarding Iranian drones, including any putative role of Co-Defendant Mohammad Abedini and his company, SDRA, in the development and manufacture of Iranian drones, or their use in attacks by Iranian forces on U.S. forces in the Middle East (or in other international conflicts).

Those complex and disputed issues are entirely irrelevant to the pending export charges against Mr. Sadeghi. **The prosecution does not allege—and the defense is unaware of *any* evidence—that *any* of the technology that Mr. Sadeghi allegedly conspired to export or exported to Iran through Switzerland was found in *any* recovered Iranian drone, or that it was intended for use in developing, manufacturing or deploying any Iranian drone.** Whatever connection Abedini may have had to any Iranian drone program, he will not be present for trial, and thus, the two "terrorism" charges against him are functionally severed from this case.

Against that backdrop, it is difficult to imagine a more prejudicial sideshow than witness testimony and physical evidence concerning fatal foreign terrorist attacks against U.S. military personnel or the use of Iranian drones in other armed conflicts.[1] And if "drone" evidence is deemed

---

[1] Confrontations between Iranian drones and U.S. forces, and horrific casualties inflicted

1

admissible, recent government disclosures beginning in late December 2025, including a 300-plus-page export report provided on January 30, 2026, and voluminous supporting documents produced on a rolling over the last week, will require a substantial continuance to permit the defense to analyze, investigate, and meet that evidence, including likely *Daubert* challenges to the government's proposed experts and opinions.

### BACKGROUND

The Superseding Indictment charges Mr. Sadeghi only with conspiring to violate IEEPA, 50 U.S.C. § 1705 *et seq.*, and ITSR, 31 C.F.R. 560, and violating those same export controls (Counts 2, 4, 7 and 8), by exporting or causing others at Analog Devices, Inc. ("ADI"), a multibillion-dollar semiconductor company where Mr. Sadeghi's worked at the time, to export "goods" and "technology"—specifically, microelectromechanical systems ("MEMS") sensors—to Abedini, an Iranian national who was living and working in Switzerland for his Swiss company, Illumove, S.A., and who, according to the government, reexported those same items to Iran.

Critically, **the Superseding Indictment charges only Abedini, and *not Mr. Sadeghi*, with conspiring to provide material support to a foreign terrorist organization**—specifically, the Islamic Revolutionary Guard Corps. ("IRGC") in Iran—in violation of 18 U.S.C. § 2339B(a)(1) (Count 9)—or providing material support to the IRGC in violation of the same statute (Count 10). The allegations that Abedini, SDRA (a company in Iran that, according to the government, Abedini co-founded and ran as CEO and/or Managing Director), or the IRGC used technology or components from the U.S. to build drones and then used those drones to attack U.S. forces in the

---

by Iranian drones used by Russia in Ukraine, are the subjects of extensive media coverage on a near daily basis. *See, e.g.*, "US carrier shoots down Iranian drone as tensions escalate and diplomatic talks hit a snag," CNN (Feb. 4, 2026), *available at* https://www.cnn.com/2026/02/03/politics/iran-drone-uss-lincoln-tensions; "Iran's drones giving Russia a critical edge in Ukraine war," Asia Times (Feb. 4, 2026), *available at* *https*://asiatimes.com/2026/02/irans-drones-giving-russia-a-critical-edge-in-ukraine-war/.

2

Middle East have nothing whatsoever to do with Mr. Sadeghi, who refused to work on projects with military applications at ADI and does not support the Iranian regime or IRGC.

Abedini is not in U.S. custody, and as the prosecution acknowledges, he will not be tried with Mr. Sadeghi. According to public reports, Abedini is in Iran, where he will presumably remain. Because Abedini will not appear, evidence in support of the terrorism-related counts against him is irrelevant. *See* Fed. R. Evid. 401. Nevertheless, the government has recently advised the defense of its intention to present extensive "drone" evidence in its case against Mr. Sadeghi.

In his affidavit supporting the initial complaint, SA Ronald Neal stated that a Shahed 101-P drone was utilized in the attack on Tower 22 in Jordan that resulted in the deaths of 3 U.S. soldiers and injuries to 47 others. SA Neal stated that firmware found in one of the microcontrollers on the drone had also been discovered in Abedini's possession in one of his accounts. Despite its obligations under Fed. R. Crim. P. 16 and Local Rule 116, the government only recently produced the forensic evidence purporting to support these claims.

On December 23, 2025, the government made a discovery production that contained two lengthy reports from the FBI's Terrorist Explosive Device Analytical Center ("TEDAC") concerning analysis of debris purportedly recovered from a drone associated with the Tower 22 attack and a second drone that was shot down 90 minutes later in Syria prior to detonation.[2] The TEDAC report for Tower 22 identifies the components being analyzed as having come from an

---

[2] The TEDAC reports are dated in July and December *2024*, respectively. SA Neal appears to have utilized photos from the report in his publicly-filed affidavit, and unlike the United States Army incident report summary for Tower 22, the TEDAC reports appear to have been facially unclassified at their inception. Under Fed. R. Crim. P. 16(a)(1)(F) and Local Rule 116.1(c)(1)(A) (requiring "reports of examinations and tests" to be produced within 28 days of arraignment), the TEDAC reports should have been produced within a month of Mr. Sadeghi's initial arraignment. Despite its obligation under Local Rule 116.1(c)(1)(A), the government has not provided an explanation for the delay of more than a year in producing the TEDAC reports to the defense.

IRN16 drone. The TEDAC report for Syria does not identify the type of unmanned aerial system (UAS) serving as the source of the components.

According to both reports, one of the modular parts examined (but notably *not* the inertial management unit ("IMU"), the "brains" of the drone) appears to contain firmware associated with SDRA, Abedini's company. But the reports do *not* identify any parts or technology in the drones corresponding to the MEMS sensors from ADI that Mr. Sadeghi allegedly caused to be exported.

On January 30, 2026, the government provided another expert report by an FBI "computer scientist" concerning "keywords or identifiers pertaining to persons and/or entities of interest withing the case" that were contained in the firmware provided by the TEDAC team.

Apart from the limited, if any, relevance and significant prejudicial effect to Mr. Sadeghi, there are significant chain of custody issues as demonstrated by the U.S. Army incident report summaries for the Tower 22 and Syria attacks and the corresponding Evidence/Property Custody Documents furnished in further productions over the last week.

On February 2, 2026, the government produced the U.S. Army incident report summary for the Tower 22 attack prepared by the 62nd Ordnance Company (EOD) and a second incident report summary for an attack that occurred 90 minutes later in Syria prepared by the 49th Ordnance Company (EOD). Both of these reports had been previously classified as secret, and they were declassified on January 14 and January 26, 2026, respectively.

The EOD Tower 22 report identified the drone in question as an IRN-16/Shahed-101P.[3] The EOD Syria report identified the drone as an IRN-16. The EOD reports consist principally of

---

[3] The report's designation of the drone as an IRN-16/Shahed 101-P is inconsistent. IRN-16 is the U.S. CENTCOM designation for the Shahed 131. Open-source reporting has not identified a designation for the Shahed 101-P. Open-source reporting, however, does reveal significant differences between the Shahed 131 and the Shahed 101-P in terms of size, propulsion, range, and manufacturing. Most relevant here is that open-source reporting identifies significant

photographs of the components collected by the EOD technicians at the scene. The Tower 22 incident report summary includes photographs of a component identified as an air data computer, an anti-jamming module, and a flight computer. The individual components within these systems are not identified in the photos (at least, not those produced to the defense) and cannot be identified from them. The Syria report provides no photos of the internal electronic components.

The government also furnished Evidence/Property Custody Documents created by EOD for the items collected at Tower 22 and Syria, respectively. The Tower 22 Evidence/Property Custody Document documents receipt of a Pelican case containing IRN-16 components (Item 1). The Evidence/Property Custody Document further documents transfer of Item 1 to Triage and then sub-components identified as exhibits to the U.S. Army Command, Control, Communications, Computers, Cyber, Intelligence, Surveillance, and Reconnaissance (C5ISR), and to TEDAC. The chain of custody fails to identify which of the collected components correspond to the referenced exhibit numbers. The TEDAC Tower 22 report likewise utilizes exhibit numbers in its inventory of parts provided and describes each of the individual parts, but beyond indicating that the source of the parts is an IRN-16 drone, it does not specify the source of the parts or the date of receipt.

The Syria Evidence/Property Custody Document similarly documents the receipt of a fuselage with engine, wings, and miscellaneous parts; the transfer of the same to Triage; and the further transfer of some of the items from Triage to TEDAC and 5CRCNT. However, the exhibit

---

differences in the components used in the manufacture of the Shahed 101-P as opposed to the Shahed 131. Shahed 101-P components appear to be manufactured in Iran, as opposed to the West. *See* https://euromaidanpress.com/2025/11/18/ukraine-inspects-russias-new-shahed-101-and-finds-every-part-is-iranian/#google_vignette.

numbers in the Syria Evidence/Property Custody Document documenting the partial transfer of items do not correspond with those in the Syria TEDAC report.[4]

More importantly, the dates for transfer from EOD in Syria to the FBI do not correspond. The Syria Evidence/Property Custody Document indicate that the transfer (shipment) to TEDAC was made on **March 5, 2024**. The Syria TEDAC report indicates that the materials included had submission dates of **February 20, 2024**, and **March 1, 2024**. The materials submitted on March 1, 2024, include the STM32F405 microcontroller that is alleged to have contained firmware from SDRA. The inconsistencies in dates of shipment are a significant break in the chain of custody necessary for authentication and, thus, admission of this drone evidence at trial.

Further, the Syria TEDAC report indicates that one item (Item 84), received on March 1, 2024, in the opinion of the examiner "could be part of a UAS [drone], but is not part of the same UAS as the rest of the Items in this [Syria TEDAC] report," strongly indicating that the integrity of the materials collected by EOD in conjunction with the Syria drone attack were at some point compromised with the inclusion of additional, unknown components. And again, this constitutes a significant break in the chain of custody, and it raises serious questions about the contamination and unreliability of the evidence at issue.

For these reasons, the defense submits that even if the probative value, if any, of the testimony and evidence regarding SDRA's firmware having been found in the debris from the Syria drone attack were found to outweigh the obvious prejudicial effect of such "drone" evidence, there

---

[4] The Syria Evidence/Property Custody Document lists the following exhibits as having been released to TEDAC: Exhibits 1.1, 1.2, 1.4, 1.4.1, 1.5, 2.1, 3.1, 3.2, 3.3, and 3.4. The Syria TEDAC report, however, does identify Exhibits received as Exhibit 1, Exhibit 3, and Exhibit 1.32. Even assuming the Syria TEDAC report broadly categorizes Exhibits 1 and 3, the numbers do not match as there is no Exhibit 2 and Exhibit 1.32.

would still be significant barriers to admission at trial, given the clear breaks in the chain of custody identified for the items examined by the FBI and computer scientist for the Syria TEDAC report.

Although the breaks in custody for the Tower 22 TEDAC report consist of omissions rather than clear contradictions, they still raise significant questions as to authenticity: as noted above, the EOD Tower 22 report is inconsistent in its identification of the type of drone utilized. In an apparent attempt to bridge this gap, the defense received from the government on January 30, 2026, a 301-page expert report by a Belgian investigative journalist, Damien Spleeters.[5] Mr. Spleeters was retained in January 2026 to identify and assess two uncrewed aerial vehicles (UAVs, also commonly referred to as "unmanned aerial vehicles" or "drones") based on fragments depicted in images provided to him by the National Security Unit, District of Massachusetts, U.S. Department of Justice.[6] After reviewing these photographs, Mr. Spleeters opined that the two drones at issue in the TEDAC reports, are, in fact, "consistent with the Shahed-family of uncrewed aerial vehicles and with manufacture by the Iran defense industrial base." Mr. Spleeters, however, does not identify the specific drone used in either attack, and therefore, he does not resolve the contradiction.

Despite these significant concerns, the government has advised that if the defense does not stipulate to the authenticity and chain-of-custody of all the proffered drone materials, it will call as many as seven active-duty U.S. military witnesses who would be "required" to appear before

---

[5] While Spleeters has apparently written extensively in the popular media about international arms trafficking and drone warfare, he is not an engineer by education or training, nor has he published any peer-reviewed academic papers (as far as the defense is currently aware), and the defense will likely mount a *Daubert* challenge to his qualifications and opinions if the Court deems the proposed drone evidence generally admissible under Fed. R. Evid. 401 and 403.

[6] Based on review of his report, the images provided to him were from the TEDAC Tower 22 and Syria Reports as well as the U.S. Army's Tower 22 and Syria Incident Report Summaries.

the jury in full uniform to testify. The result would not only be that Mr. Sadeghi would have to sacrifice his right to contest disputed facts in order to avoid the prejudicial effect created by multiple uniformed service members testifying against him in this case, but also a trial within a trial as to the items in question, creating the risk of confusion of the jury regarding the charges before them.

## ARGUMENT

**I.      Evidence about Iranian drones is irrelevant and risks unfair prejudice.**

"[T]errorism-related evidence is often emotionally charged." *United States v. Mehanna*, 735 F.3d 32, 64 (1st Cir. 2013) (noting that "courts, with good reason, have termed [evidence about terrorist activity and attacks] as 'alarming,' 'disturbing,' and even 'blood curdling'"). As a result, "[t]here can be little doubt that . . . evidence linking a defendant to terrorism in a trial in which he is *not charged with terrorism* is likely to cause undue prejudice." *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (emphasis added). That is the case here.

It is difficult to imagine a government presentation that would be more prejudicial to Mr. Sadeghi than the introduction of evidence about Iranian drones that were used in attacks on U.S. forces, events in which Mr. Sadeghi played no role and about which he knows nothing. *See* Fed. R. Evid. 401. While the government has stated that it would refrain from introducing evidence about the "impact" of the Tower 22 attack—meaning the most graphic evidence about the extent of death and destruction at that site—that limited concession hardly reduces the obvious risk of prejudice since Iranian drones are widely understood to be used by terrorists against U.S. troops and against civilians in multiple armed conflicts around the world. *See* Fed. R. Evid. 403.

Indeed, even in cases where defendants—unlike Mr. Sadeghi—are, themselves, charged with engaging in or supporting terrorist activities, "highly charged and emotional evidence" that

has "minimal evidentiary value" has been held to be inadmissible under Rule 403. *United States v. Al-Moayad*, 545 F.3d 139, 160 (2d Cir. 2008). For example, in *Al-Moayad*, the defendants were charged with providing material support to Hamas. At trial, the government presented evidence concerning a fatal bus bombing by Hamas in Tel Aviv. On appeal, the Second Circuit held the admission of such inflammatory evidence was improper, because "the government did not introduce any evidence connecting [the defendants] to that or any other terrorist act." *Id.* at 160 (holding evidence was inadmissible, but error was not reversible).

The same is true in this case. The government will offer no evidence connecting Mr. Sadeghi to the drone strike on Tower 22, any terrorist attack by Iranian forces, or any other use of Iranian drones in international conflicts. There is no such evidence, as the government well knows. The only purpose for any evidence about drone strikes by the IRGC, a "foreign terrorist organization," is "a blatant appeal to the jury's emotions and prejudices," *id.* at 161, which would be improper and deny Mr. Sadeghi any hope of a fair trial.

## II.    A continuance would be necessary to prepare for a trial about Iranian drones.

The introduction of terrorism-related evidence about drone strikes by Iranian forces would require a continuance to provide the defense with adequate time to prepare. It would also significantly complicate and unnecessarily lengthen the anticipated two-week jury trial. As noted, the governments witness list includes 7 fact witnesses and 2 expert witnesses who would testify about the use of drones by Iranian forces and the components of recovered drone debris. Again, the government has no evidence linking those drones to Mr. Sadeghi.

The prosecution's relevance argument appears to be that Abedini and other unindicted co-conspirators worked for SDRA in Iran (in addition to Illumove in Switzerland) and that SDRA (not Illumove) supplied technology to the IRGC or otherwise assisted in the development or manufacture of drones. But those facts, even if the prosecution could prove them at trial, would

have no bearing on the export charges against Mr. Sadeghi—that is, whether he willfully exported controlled technology or goods from the U.S. to Iran, either directly or indirectly through Abedini in Switzerland.

As the government knows, Illumove was an operating company in Switzerland; Abedini worked for Illumove (while also holding a position at the Swiss Federal Institute of Technology ("EPFL")); ADI had a contract for Illumove to provide know-how and services to ADI; pursuant to that contract, ADI provided certain sample parts and information to Illumove (which it could easily have purchased in much larger quantities on the open market), Illumove successfully created an "evaluation board" for ADI, and ADI paid Illumove for that valuable work.[7]

As the government also knows, the issue about whether SDRA designs, develops, or manufactures technology used in military drones for Iranian forces is a red herring—and a dangerous one. There is no evidence, in the prosecution's expert reports or elsewhere, that any parts or information that ADI sent to Illumove actually ended up in the drones that Iranian forces used to attack U.S. forces. In fact, as detailed above, the forensic investigators who examined the recovered pieces from those drones confirmed that they did not include parts or information from ADI. From Mr. Sadeghi's perspective, that recent revelation—which puts the lie to the prosecution's baseless drone allegations against him in this case—is no surprise, because the sample parts that ADI provided to Illumove to complete the evaluation board project, on which

---

[7] Even assuming Abedini or anyone else associated with Illumove violated the contract with ADI and misused parts or information for some other unauthorized purpose in Iran, that would only indicate Abedini or Illumove breached the contract and may be subject to civil liability. It would not be relevant evidence that Mr. Sageghi willfully committed the charged export offenses or any other criminal offense.

Mr. Sadeghi worked with many other employees of ADI, had no application to military drones.

If the Court determines that government's recently provided drone evidence and related testimony are admissible, the defense will need a continuance to obtain its own expert to demonstrate that the evidence has no relevance to the alleged conspiracy between Mr. Sadeghi and Abedini and to challenge the flawed conclusions of the government's proposed experts.

Among other issues, the government's recently disclosed expert, Mr. Spleeters, identifies the navigation boards for both drones as consistent with Iranian and Russian drones that he has examined in Ukraine, and that the navigation boards were consistent with a commercial production, rather than hobby or improvised navigation systems. Further, in his experience "documenting multiple Iranian-manufactured Shahed-series systems, this specific combination of layout, enclosure integration, and component organization [of navigation boards] recurs across examples of those systems." Beyond identifying the commonality, however, Mr. Spleeters does not identify the source of the critical navigational components. Likewise, the TEDAC reports omit the source of those components.

Based on review of the part number at issue, the STM32F405 is manufactured by STMicroelectronics, a Swiss company.[8] STMicroelectronics has factories worldwide. One factory which produces the STM32F405 is located in Shenzhen, China.[9] The STM32F405 may be purchased directly from wholesaler distributors in Shenzhen at a price of between $5 and $25.[10] In other words, this "evidence" has no apparent connection to Mr. Sadeghi; his former employer, ADI, or even any other company in the U.S.

---

[8] https://www.st.com/en/microcontrollers-microprocessors/stm32f405-415.html.

[9] https://www.st.com/content/st_com/en/about/manufacturing-at-st/our-facilities.html.

[10] https://www.ebay.com/itm/405443271837

Given these facts, the defense is confident that it would be able to obtain a qualified expert in electrical engineering and procurement (background and training that Mr. Spleeters lacks) who could testify that it is much more likely that the IRGC made bulk purchases of the STM32F405 directly from China or with Russian assistance for use in their drone program. Such a conclusion would directly rebut the government's mistaken allegation that Abedini's company in Switzerland, Illumove, was a "front" and that its work with ADI was a sham to provide cover for the large-scale purchase of these U.S.-origin items that were supposedly necessary to support Iran's military drone program.

## CONCLUSION

Accordingly, Mr. Sadeghi respectfully requests that this Court exclude all evidence and argument regarding Iranian military drones, including their alleged development and/or manufacture by SDRA or their use in attacks by Iranian forces or in other international conflicts.

Respectfully submitted,

**MAHDI SADEGHI**

by his attorneys,

/s/ Daniel N. Marx
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

/s/    Charles Swift
Charles D. Swift (pro hac vice)
Sufia M. Khalid (pro hac vice)
MUSLIM LEGAL FUND OF AMERICA
100 N. Central Expy., Suite 1010
Richardson, TX – 75080
(972)-914-2507
*cswift@clcma.org*
*skhalid@clcma.org*

13

**LOCAL RULE 7.1 CERTIFICATION**

Defense counsel certify that they conferred in good faith with counsel for the government in an effort to resolve or narrow the issues described herein.

/s/ William W. Fick

**CERTIFICATE OF SERVICE**

I, William W. Fick, hereby certify that on February 6, 2026, I caused this document to be filed through the ECF system.

/s/ William W. Fick