IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAHDI SADEGHI | No. 1:24-cr-10391-IT<br><br>*[LEAVE TO FILE GRANTED,*<br>*May 1, 2026]* |

**DEFENDANT MAHDI SADEGHI'S REPLY IN SUPPORT OF MOTION FOR RELEASE IN LIGHT OF CHANGED CIRCUMSTANCES, PURSUANT TO 18 U.S.C. § 3142(f)**

Defendant Mahdi Sadeghi respectfully responds briefly to select points made by the government in its Opposition [D.E. 259] ("Opp.") to his Motion for Release in Light of Changed Circumstances, Pursuant to 18 U.S.C. § 3142(f) [D.E. 256] ("Mot."). The circumstances are different today than when this Court considered bail over a year ago, for several reasons: (1) the government's case is more attenuated and legally complicated; (2) Mr. Sadeghi has spent 16 months in custody; (3) exculpatory evidence not previously available to Mr. Sadeghi undercuts the purported strength of the government's case; and (4) the ongoing war against Iran reduces both the likelihood that Iran could facilitate an opportunity to flee and that Mr. Sadeghi would avail himself of any opportunity to live amidst the blackouts and bombs in Iran. Given all of the current circumstances, it is entirely appropriate for this Court to take a second look at its previous detention decision, despite the First Circuit's summary affirmance. *See United States v. Gonzales Claudio*, 806 F.2d 334, 343 (2d Cir. 1986) (ordering release after previously upholding detention); Mot. at 4-5, 11 (collecting cases reconsidering initial detention).

I.    **THE GOVERNMENT'S CASE IS MORE FACTUALLY ATTENUATED AND LEGALLY COMPLICATED THAN IT WAS BEFORE.**

A.    **The conspiracy count does not "shore up" the substantive counts.**

The government first argues that the conspiracy count shores up its case against Mr.

Sadeghi on the substantive charges. *See* Opp. at 3 (highlighting *Pinkerton* and arguing, "the strength of the conspiracy charge carries through to the substantive charges"). But *Pinkerton* applies only to acts committed *by co-conspirators*. *See United States v. Sanchez*, 917 F.2d 607, 612 (1st Cir. 1990) ("Under the *Pinkerton* theory a conspirator may be subjected to vicarious criminal liability for a substantive crime committed by a co-conspirator in effecting their conspiracy."). Mr. Sadeghi's ADI colleagues, who sent the charged shipments, are not alleged co-conspirators. *See* Opp. at 4 (noting they lacked "knowledge of the end destination"); *cf. United States v. Sleugh*, 827 F. App'x 645, 648 (9th Cir. 2020) (noting, "*Pinkerton* liability is vicarious, which means that to convict Sleugh based on a *Pinkerton* theory, the jury must have found that a co-conspirator had the *mens rea* for the substantive offense"). The conspiracy charge is not "strong," and it does not "carry through to the substantive charges." Opp at 3.

> **B.**     **Even if the government were entitled to present its "causation" theory to the jury, the charges in the Superseding Indictment are more indirect than the previous charges and they are undercut by the evidence.**

Mr. Sadeghi has argued, and continues to argue, that the government's "causation" theory should not be permitted. *See* Mot. at 9; D.E. 205 at 1-3 (Def. Obj. to Govt. JI). But whether it is permitted to proceed on that theory or not, it originally charged Mr. Sadeghi himself with sending items directly to Abedini. It now charges that Mr. Sadeghi is criminally liable for *other people*'s exports to Abedini, in Switzerland.

Even assuming for the sake of argument that the government is permitted to prosecute Mr. Sadeghi for "causing" his colleagues to export ADI products to Abedini, pursuant to ADI's contract, there are serious factual questions about whether the government will be able prove that, under any definition.[1] *See, e.g.,* Sealed Ex. C at USAO_409451 ("[Engineer Pablo] Del Corro

---

[1] The government argues that the definition of causation is "straightforward." Opp. at 5. But it has still not proposed any workable definition. It suggests a purely factual view of causation. *See id.;*

would ship these parts to Illumove to complete the project. Mark Looney was Del Corro's boss and would tell him to ship parts to Illumove as the project progressed"); Sealed Ex. E at USAO_419594 ("It was Ian Beavers and Pablo Del Corro's responsibility to get Illumove the ADI parts they needed for the project"); Sealed Ex. F at USAO_419387 ("When it comes to ADI providing product samples to Illumove for this project, [Ian] Beavers would initiate the process. From there, he would have the secretary or administrative assistant enter it into [ADI's] SAP software. The request would be reviewed by other ADI departments where questions like who the parts were for, how many were needed, are they being paid for, and why the customer or vendor needed them may have to be answered. There would also be a compliance check as well"); *id.* ("there was a distinction between the marketing team saying a product could be released, and the product being authorized to be shipped according to a trade compliance review"); Sealed Ex. B at USAO_419294 ("Sadeghi recommended Abedini for the project, but *the decision was not Sadeghi's to make. Hiring Abedini for the project was a consensus decision at ADI* made after putting together a table with pros and cons of the companies competing for the project. Illumove scored the best and was selected.") (emphasis added).

Moreover, the government's argument that ADI only collaborated with Illumove and shipped products to Illumove/Abedini because of Mr. Sadeghi's "lies and material omissions," Opp. at 5, is undercut by the fact that *ADI had already exported materials to Abedini, before Mr. Sadeghi was involved*. *Contrast* Mot. at 10 (discussing ADI's shipments to Abedini prior to Mr.

---

*but cf. Paroline v. United States*, 572 U.S. 434, 446 (2014) (stressing the importance of proximate/legal causation and collecting cases requiring proximate causation). The government points to one definition that "to cause" means to "bring about," as used in *United States v. Guanghua*, Case No. 23-cr-00091-CKK, D.E. 256 (D.D.C. Sept. 25, 2025). *But see id.* D.E. 390 (jury note stating, "we are debating the instructions including definitions of basic words within the instructions").

Sadeghi's involvement) *and* D.E. 102 at 51-54 (Court's discussion of same), *with* Opp. at 5 (arguing "Abedini . . . became ADI's contracted vendor with the Defendant's help through lies and material omissions"); *id*. ("Had ADI known this information, it would not have contracted with Abedini or Illumove for the evaluation board project, which was the basis for exporting products to Abedini and Illumove").

> **C.** **The government's indirect liability theory on the front end is piled on top of its indirect theory on the back end: that the exports send *to Switzerland* should be considered exports "to Iran" because Mr. Sadeghi had "reason to know" – or should have known – Abedini might reexport the items to Iran.**

Here, again, the viability of the government's "reason to know" theory is disputed. *See* D.E. 218 at 3-4; *United States v. Ford*, 821 F.3d 63, 73 (1st Cir. 2016) ("having 'reason to know' suggests a negligence standard" and "materially deviates from the traditional *mens rea* formulation that the defendant know the facts that make his conduct illegal" (cleaned up)).

The government argues it can satisfy § 1705(c)'s "willfulness" *mens rea* if it proves the "exporter *knows (or has reason to know) the goods are intended [by the recipient] for Iran."* Opp. at 6 (emphasis added). It gets there by relying on *regulations* that define exports "to 'Iran'" to "include[]" exports "to Switzerland" with "reason to know" the Swiss recipient intended to reexport to Iran. *Id*. (citing 31 C.F.R. § 560.204(a)). But of course, the Treasury Department has no authority to broaden the scope of a crime defined by Congress, nor to lessen the *mens rea* standard Congress established for that crime.

Further, the Supreme Court has made clear, in case after case after case, that the *mens rea* of an offense applies to each element that separates wrongful conduct from innocent. *See Ruan v. United States*, 597 U.S. 450, 458 (2022) ("We have [] held that a word such as 'knowingly' modifies not only the words directly following it, but also those other statutory terms that 'separate wrongful from innocent acts'"); *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) ("[we] start

4

from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct'"); *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) ("courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word "knowingly" as applying that word to each element"). Shipping products to Switzerland is innocent conduct. *See United States v. Singer*, 963 F.3d 1144, 1156 (11th Cir. 2020) (finding the exportation of goods from the United States is "otherwise innocent conduct"). Shipping goods to Switzerland while *negligently* ignoring the "reason to know" the Swiss recipient might reexport the goods to an embargoed country is not a crime under § 1705(c).

## II. PREVIOUSLY UNAVAILABLE EXCULPATORY EVIDENCE SHOWS THE GOVERNMENT'S CASE TO BE WEAKER THAN IT MAINTAINS.

Mr. Sadeghi provided an extensive sampling of exculpatory evidence in his Motion, all of which was previously unavailable to the defense or the Court, and all of which he urges the Court to consider now. *See* Mot. at 12-15. The evidence reveals the weakness of the government's case.

The government seeks to deflect the substantial evidence that ADI independently chose to contract with Abedini. *See* Opp. at 9 (arguing that even if ADI "had . . . engaged in a thorough vendor selection process fully divorced from the Defendant's influence, that fact is immaterial to Defendant's . . . participation in the conspiracy"); Mot. at 12-14. The argument is striking because the ADI-related allegations are the core of the government's case. Had ADI undertaken to contract with Abedini/Illumove and sent him the charged products entirely on its own, the conspiracy charge itself would look weak, with no actual exports or attempted exports. Moreover, the government would have very little evidence with which to prove even an entirely inchoate conspiracy: it has no cooperating witnesses and no witnesses with any knowledge of Iran, SDRA, or Abedini's activities outside the legitimate work he and Illumove did on ADI's evaluation board

project. *Cf., e.g.,* Sealed Ex. E at USAO_419595 ("Galchev thought Illumove was doing a good job with the project"); Sealed Ex. G at USAO_419392 ("Illumove was perceived as a nimble and strong contractor in the market, so due to its success on [the] first project and Ian Beavers' praise, lllumove was also recommended for other projects over time at ADI").

The government likewise seeks to minimize the evidence that Mr. Sadeghi specifically *declined* to be involved in military projects. *See* Opp. at 9-10; Mot. at 14-15. Whether labeled "pacifism" or something else, the point is the evidence substantially undercuts the government's narrative that Mr. Sadeghi sought from day one to smuggle military technology to Abedini so that Abedini could provide it to the IRGC's drone program. The reality – as told by the government's own witnesses – is that Mr. Sadeghi wanted nothing to do with ADI's military technology, eschewed the opportunity to obtain military secrets, and sought specifically and solely to work on projects with industrial and medical applications. *See* Mot. at 14 ("Sadeghi did not want anything in defense and requested to work in the medical and industrial markets"); *id*. at 15 (similar examples). It is true that one can violate the ITSR by shipping paper clips, or baby dolls, or ballpoint pens to Iran, and the government need not prove Mr. Sadeghi sought to ship military technology, specifically. But that has been the thrust of its case since the start, and the bulk of its evidence and exhibits are aimed at showing exactly that. *See, e.g.,* GX 37, 39, 40, 198 (related to the "Sepehr" technology); GX 36, 86 (related to SDRA's alleged attempts to obtain favorable tax status based on its work with military technology); GX 140, (re: "fusion algorithms"); GX 2, 49. (documents regarding SDRA's purported military orientation). But absent the nefarious accusation that Mr. Sadeghi was trying to smuggle dangerous military technology to Iran, Mr. Sadeghi had no reason to intentionally break the law. *See United States v. Mankani*, 738 F.2d 538, 547 n.1 (2d Cir. 1984) ("It is . . . clear that the requisite mental state for conspiracy is intent, not mere

knowledge") (citations omitted). And absent the "military technology" narrative, Mr. Sadeghi's relationship with Abedini and attempts to assist Abedini look like "human activity without criminal connotation." *Id.* at 547. Indeed, the most reasonable inference from the limited evidence is that Mr. Sadeghi was motivated to benefit his employer, ADI, by introducing a vendor, Illumove, to provide a valuable service to ADI pursuant to a contract with ADI, *not* by any unlawful intent to help Abedini re-export products from ADI to Iran. Notwithstanding the government's response, the "pacifism" evidence significantly undercuts its case.

## III. THE WAR IN IRAN DECREASES THE MARGINAL RISK OF FLIGHT AND THE FACT REMAINS THAT NOTHING IN MR. SADEGHI'S HISTORY ADMITS OF ANY "PROPENSITY" TO FLEE.

The government suggests that the war against Iran is not a circumstance that warrants a re-evaluation of the flight risk here, because the "conflict" "continues to evolve" and "diplomatic talks" are underway. Opp. at 10. But there is nothing good one can say about living in Iran today. After Trump threatened to destroy the "whole civilization" of Iran,[2] he is now suggesting the war could go on for *years*.[3] Iran's economy is in a "Death Spiral."[4] The reality is that, as a general matter, flight from federal charges is a rare occurrence, and given the current and continuing conditions in Iran, the likelihood that Mr. Sadeghi would run to Iran now is vanishing low.

The government asserts that the besieged Iranian government could create and send a

---

[2] Gritten, D., "Trump condemned over threat that Iran's 'civilisation will die'" *BBC* (Apr. 7, 2026), https://www.bbc.com/news/articles/cwyk7xgkzvzo

[3] "Trump sees blockade extension as best option for forcing Iran back to the negotiating table," *CNN* (Apr. 29, 2026). https://www.cnn.com/2026/04/29/politics/blockade-extension-trump-iran-war

[4] Stancati et. al., "Iranians Feel the Pain as Their Economy Descends Into a Death Spiral," *Wall Street Journal (*Apr. 29, 2026). https://www.wsj.com/world/middle-east/iranians-feel-the-pain-as-their-economy-descends-into-a-death-spiral-47dba669

passport for Mr. Sadeghi, who could reach Iran using land routes, if not by air. *See* Opp. at 10. In support, it cites an article stating, "dozens of Iranians . . . have made an arduous land journey through the[] snow-encrusted mountains . . . to Turkey, so that they can connect to the internet" and find "respite from the bombing." Opp. at 10 n.3.[5] This is hardly a ringing endorsement of life in Iran, or of the Iranian government's capacity to smuggle Mr. Sadeghi out of the United States. Mr. Sadeghi would not leave his children in the United States or put them in harm's way by taking them either to Iran or "on the lam" internationally. Not only are the circumstances in Iran horrible at this time, but nothing in Mr. Sadeghi's history shows any "propensity" to flee, disregard obligations, or live a life in hiding. *See United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991) (affirming release of mafia crime boss where "The most compelling consideration -- the Mafia's ability to aid flight -- is not supplemented by evidence of *this Mafia member's* propensity to flee" (emphasis in original)); Mot. at 5-6 (citing cases requiring an individualized propensity to flee, in addition to opportunity).

Finally, the question before the Court is not whether there is any theoretical *possibility* that Mr. Sadeghi could attempt to flee, and could do so without the government noticing or stopping him. Rather, the question is whether conditions can "reasonably" address any such risk.[6] 18 U.S.C. § 3142(b), (c) & (e); *United States v. Tortora,* 922 F.2d 880, 884 (1st Cir. 1990) ("Undoubtedly, the safety of the community can be reasonably assured without being absolutely guaranteed");

---

[5] *See* "Iranians are leaving the country just to access the internet," *NPR* (Apr. 22, 2026), https://www.npr.org/transcripts/g-s1-118339 , cited at Opp. at 10 n.3.

[6] *See also* United States Courts, "Pretrial Release and Detention in the Federal Judiciary" (citing "efforts [] underway within the Judiciary to increase release rates during the pretrial phase of federal criminal cases"), https://www.uscourts.gov/about-federal-courts/probation-and-pretrial-services/pretrial-services/pretrial-release-and-detention-federal-judiciary#:~:text=The%20Bail%20Reform%20Act%20of,release%20rates%20while%20protecting%20communities.

*United States v. Almohandis,* 297 F. Supp. 2d 404, 405 (D. Mass. 2004) ("the statute does not *require* that the . . . conditions of release [] *guarantee* that the defendant will appear if released; the evidence must only support the proposition that the conditions set will reasonably assure the defendant's appearance") (emphasis added). He submits that they can.

## CONCLUSION

Given all of the circumstances today, Mr. Sadeghi submits that any risk of flight can be reasonably addressed through release conditions and the Court should grant him bailin advance of trial, where he looks forward to proving that he is not guilty of the government's new, more attenuated, and unsupported allegations that he violated U.S. export laws or conspired to do so.

Respectfully submitted,

**MAHDI SADEGHI**

by his attorneys,

*/s/ Amy Barsky*
Amy Barsky (BBO # 601111)
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

## CERTIFICATE OF SERVICE

I, Amy Barsky, hereby certify that on May 1, 2026, I caused this document to be filed through the ECF system.

/s/  *Amy Barsky*
Amy Barsky